[Civ. No. 19038. First Dist., Div. One. May 29, 1961.]

GEORGE KOTRONAKIS, Respondent, v. THE CITY AND COUNTY OF SAN FRANCISCO, Appellant.

Dion R. Holm, City Attorney, and John J. Taheny, Jr., Deputy City Attorney, for Appellant.

Stanley P. Makay for Respondent.

DUNIWAY, J.—The city and county of San Francisco appeals from a judgment against it, rendered upon the verdict of a jury in an action for personal injuries, and from an order allowing plaintiff costs and an order denying the city's motion to tax costs. The case was submitted to the jury upon two theories; one, that plaintiff was a passenger on the city's municipal railway, a common carrier (see Civ. Code, § 2100), and two, that plaintiff could recover under the Public Liability Act. (Gov. Code, § 53051.)

The city asserts that the evidence is insufficient to sustain the verdict and judgment against it on either theory. It also asserts error in allowing costs and refusing to tax costs. We conclude that the evidence is not sufficient to sustain the verdict and judgment. Since the judgment must be reversed, the matter of trial costs will be set at large, being merely

incidental to the judgment. (*Purdy* v. *Johnson,* 100 Cal.App. 416, 420-421 [280 P. 181] ; *Estate of Williams,* 110 Cal.App.2d 50, 52 [242 P.2d 26].) It is therefore unnecessary to consider the award of costs below.

1. *The evidence was insufficient to sustain the verdict on the theory of the city's liability as a common carrier.*

## THE FACTS

The claim being that the evidence is insufficient, we must examine it in the light most favorable to respondent, who prevailed below. If there is any substantial evidence, contradicted or not, to sustain the verdict, appellant must fail. (*Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183].)

At about 7 o'clock on the morning of Monday, September 16, 1957, as was his custom, respondent purchased food for his lunch at the Cosmopolitan Market, on Third Street in San Francisco. He began walking north from there, a point some 120 feet south from the corner of the building at Third and Folsom Streets, toward that corner. He was looking for a Number 15 bus, which would be coming south on Third. As he approached the corner there was on his right an area extending some 90 feet south from the corner, along the curb, marked on the pavement as a bus stop. There was a southbound bus across the intersection approaching the north side of Folsom, but too far away for him to see its number. He walked to a point between 10 and 26 feet south of the corner of the building, and saw the number of the bus, which was a Number 15. At that point, he stepped on a puddle of vomit on the sidewalk, near the curb, and fell, sustaining injuries. The bus was then either crossing or about to cross Folsom, and immediately after his fall pulled into the bus stop and picked up two passengers. It then pulled away. There is no evidence that respondent signalled to the driver, or that he otherwise signified a desire to board the bus. He was at a point somewhat closer to the corner than that at which one would normally be to board the bus. There is no evidence that the bus driver knew that he desired to board. Respondent testified that the front door of the bus, through which passengers board, stopped opposite to where he was lying.

## THE LAW

The city urges that, at the time of the accident, respondent had not yet become a passenger, citing such cases

as *Hildebrant* v. *San Francisco,* 69 Cal.App. 590 [231 P. 1008], and *Lagomarsino* v. *Market Street Ry. Co.,* 69 Cal. App.2d 388, 395-396 [158 P.2d 982]. See also *Sanchez* v. *Pacific Auto Stages,* 116 Cal.App. 392, 396 [2 P.2d 845], and *Grier* v. *Ferrant,* 62 Cal.App.2d 306 [144 P.2d 631]. While we think that its contention is probably correct, we prefer to rest our ruling on another ground.

Here, at the time of his fall, respondent intended to board the bus, but certainly had not commenced to do so. He was on a public sidewalk, along with other members of the public, and that sidewalk was not a part of the municipal railway, even to the extent that a railroad station platform is a part of the railroad. We do not think that it would be proper to impose upon the municipal railway in its capacity as a common carrier, any duty to maintain the city's sidewalks in a safe condition merely because patrons of the line board and alight from its buses on the sidewalk. Two cases, while not precisely in point, are persuasive.

In *Choquette* v. *Key System Transit Co.,* 118 Cal.App. 643 [5 P.2d 921], the court had to decide whether a streetcar stop was the equivalent of a station in two different contexts. The court's first inquiry was whether the "station exception" to the "stop, look, and listen" rule applied to streetcar stops; the other problem discussed was whether the streetcar company was negligent in not warning the plaintiff of the approach of a train which crossed her path of departure from the streetcar. In each instance the court concluded that the streetcar stop was not equivalent to a "station," stating with respect to the first inquiry: " 'The general rule just considered that in the case of a carrier having exclusive control of its tracks and stations one traveling may still retain the status of a passenger after alighting from the carrier's vehicle, is from the nature of things not applicable to carriers not so situated, as, for instance, persons traveling on street railway cars. While a passenger attempting to alight from a street-car remains a passenger until he has accomplished the act of alighting in safety, and the carrier owes to the passenger attempting to alight that very high degree of care and attention which the law puts upon it generally to the end of promoting the safety of its passengers, and will be liable for negligent injury to the passenger while so alighting, it is the generally accepted view that one who has alighted from a street-car and is in safety upon the highway is no longer a

passenger, but is thenceforth a traveler upon the highway and subject to all the duties and obligations imposed upon such travelers, and the railway company is not responsible to him as a carrier for the condition of the street or for his safe passage from the car to the sidewalk.' '' (P. 653.)

Regarding the second inquiry, the court said: '' 'Courts have differentiated between the duties of a street car company to its passengers and a commercial railway in so far as a duty rests upon them to furnish safe passage to and from a car. From the nature of things a street car company cannot discharge those duties with respect to passengers. It has no control over the streets or traffic upon the streets; it has no stations or platforms and can erect none upon the street. From the curb to the car is a public place open to travel by all, and over it the company has no control or jurisdiction.' '' (P. 655.)

In *Northrup* v. *Pacific Elec. Ry. Co.*, 8 Cal.App.2d 189, 193 [47 P.2d 365], the plaintiff was hit by a negligently driven automobile while waiting for a street car in the defendant's '' 'Street Car Stop.' '' The court quoted much of the foregoing language from *Choquette* and then stated: ''Under the circumstances of this case the plaintiff did not yet sustain to the company the relation of passenger. He was a pedestrian upon the highway to whom all other travelers owed a reciprocal duty of reasonable care. But the company did not owe him the duty of anticipating that strangers over whom it had no control would be guilty of negligence which would result in plaintiff's injuries upon a street over which it had no control, but with which plaintiff was as familiar with conditions as the company; . . .''

While both *Choquette* and *Northrup* are distinguishable from the instant case, the basic distinction which they draw between railroad stations and street car stops is well founded. As appellant most cogently points out: ''. . . The duty whose violation is charged must be one imposed *because* the city is a common carrier. Consequently, if such a duty as that contended for by plaintiff exists it is one which is imposed on every common carrier. In other words, it is plaintiff's contention that it is the duty of all the taxicab companies who have hundreds of curb taxi stands in San Francisco and the duty of various interurban bus companies, such as Greyhound and Key System, who load and unload passengers at numerous curb bus zones, to clean and maintain the public

sidewalks traversed by persons who occupy the status occupied by plaintiff at the time of his fall. . . .''

The result might be different if the city had, by stopping the bus next to some obvious hazard, forced plaintiff to negotiate the hazard in boarding the bus, but that is not this case.

2. *The evidence is insufficient to sustain the verdict under the Public Liability Act.*

### THE FACTS

On this question, the evidence is as follows: On the morning in question there were three or four spots of vomit on the sidewalk in the area where respondent fell. One was "big." There were more around the corner, on Folsom. When respondent had been there in the past, the sidewalk "was clean, clean." "Sometimes they keep them clean, sometimes anybody can see many many dirts around there." Another witness had seen the same condition (vomit and bottles) there "many times," not otherwise fixed, before. However, he did not see such a condition the day before (Sunday). Vomit occurs in some other places on Third Street. Vomit and empty bottles are frequently on the sidewalk in front of the Cosmopolitan Market early in the morning. A witness had seen similar things at unspecified times "from Folsom down to Harrison [1 block], down to Bryant [2 blocks]." Still another witness had also seen at unspecified times, bottles and vomit on previous occasions, "on Third Street, Howard Street, Mission Street, and a little near Market." The condition is worse on Monday mornings. This witness saw vomit in the area where respondent fell on the night before (Sunday). The proprietor of the store in front of which respondent fell said that vomit on the sidewalk "happened so often, I don't remember. I don't remember what day it is . . . not every day, just once in a while, something like that."

It is apparent that the occurrence of vomit where respondent fell, as well as in other parts of the "skid road" area of which it is a part, is frequent. But there is a total lack of evidence that the particular vomit on which respondent slipped had been there longer than over night.

### THE LAW

Under the Public Liability Act, Government Code, section 53050 ff., the city's liability is limited to a dangerous or defective condition of which the city has notice or knowl-

edge, and which it fails to remedy within a reasonable time.
■ Where there is no evidence of actual notice, the city is charged with constructive notice if the defects have existed for such length of time and are of such conspicuous character that a reasonable inspection would have disclosed them. (*Reinach* v. *City & County of San Francisco*, 164 Cal.App.2d 763 [331 P.2d 1006].)

■ While both the notoriety of the condition (*Union Transportation Co.* v. *County of Sacramento*, 42 Cal.2d 235 [267 P.2d 10]) and the length of time it must have existed (*George* v. *City of Los Angeles*, 51 Cal.App.2d 311 [124 P.2d 872]) are normally questions of fact which are to be resolved by the jury, if the evidence as to either of these elements is insufficient *as a matter of law* the jury's verdict can not stand. (*Whiting* v. *City of National City*, 9 Cal.2d 163 [69 P.2d 990], and *Watson* v. *City of Alameda*, 219 Cal. 331 [26 P.2d 286].)

■ We think that it would be carrying the doctrine of constructive notice too far to attribute to the city notice of the presence of the vomit on which plaintiff slipped. As a practical matter, if we were to do so, the city would have to have inspectors circulating throughout the area, day and night, and particularly on Sunday nights, to discover and remove such material from the sidewalks. In our opinion, to state this proposition is to refute it.

Analogous are *Watson* v. *City of Alameda, supra,* 219 Cal. 331, and *Burnett* v. *City of San Diego,* 127 Cal.App.2d 191 [273 P.2d 345, 47 A.L.R.2d 1079]. In *Watson,* the plaintiff, who was walking across a street, slipped and fell on wet paint on lines marking a pedestrian crossing lane. The accident occurred shortly after the painting was done and the latter was not protected by barricades or otherwise. The court reversed a judgment for plaintiff, holding that the condition had not existed long enough to constitute a constructive notice to any responsible officer of the city. In *Burnett,* a similar result was reached, where the plaintiff fell because of the accumulation of some leaves on the steps of a city owned building. The accident occurred in the evening; the steps had been swept that afternoon. The court commented that the ''city could not reasonably be required to keep a man there at all times when the stairway might be used, to sweep up each leaf as it fell.'' A similar comment could also be made as to the condition of the sidewalk of which respondent complains in this case. Cases involving broken sidewalks, holes

in pavements, and other similar conditions of a more or less permanent character (that is, permanent unless repaired) are quite different from this case, which involves a transitory condition as is shown by plaintiff's own testimony that sometimes the sidewalk was clean, sometimes not.

After this matter was argued, the Supreme Court decided the case of *Muskopf* v. *Corning Hospital Dist.*, 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457], in which it held that "the rule of governmental immunity from tort liability . . . must be discarded as mistaken and unjust." (P. 213.) We then set aside the submission and asked the parties to brief the question of the effect of that decision upon plaintiff's asserted cause of action under the Public Liability Act. (The city has never had immunity in its capacity of operator of a common carrier.)

We are of the opinion that *Muskopf* has no effect upon the Public Liability Act. It is one thing for the courts to abandon a court-made rule of immunity. It is quite another thing to say that a decision which does so also, in effect, amends or repeals a statute whereby the Legislature has waived the immunity but with a provision that certain conditions must be met before the injured party can recover. The courts are not the primary lawmakers of this state; the Legislature is. "The legislative power of this state shall be vested in a Senate and Assembly which shall be designated 'The Legislature of the State of California' . . ." (Cal. Const., art IV, § 1, and see art. III, § 1; *Allied Properties* v. *Department of Alcoholic Beverage Control*, 53 Cal.2d 141 [346 P.2d 737], and *Sandstrom* v. *California Horse Racing Board*, 31 Cal.2d 401, 412 [189 P.2d 17, 3 A.L.R.2d 90].) "A judge is not required to approve every statute or precedent by which his decision is governed. Like other citizens, he is bound, not to believe in a particular law, but to obey it." (*Weil* v. *Weil*, 37 Cal.2d 770, 776 [236 P.2d 159]; and see *Lucas* v. *City of Los Angeles*, 10 Cal.2d 476, 485 [75 P.2d 599].) We find nothing in the Muskopf opinion indicating an intent to modify or abrogate any of the provisions of the Public Liability Act.

Moreover, the Public Liability Act presents a rather special situation as to the application of *Muskopf* to this case. In the Improvement Act of 1911, which is now division 7 of the Streets and Highways Code, the Legislature specifically provided for an immunity of the city in such cases as this (Sts.

& Hy. Code, § 5640). When that law was enacted, there also existed in this state the judge-made, common-law rule of governmental immunity from tort liability. (See *Vater* v. *County of Glenn,* 49 Cal.2d 815 [323 P.2d 85], *Talley* v. *Northern San Diego County Hosp. Dist.,* 41 Cal.2d 33 [257 P.2d 22], and earlier cases cited in *Muskopf* (55 Cal.2d at p. 217).) This, however, does not mean that the Legislature could not enact a statute establishing or codifying the immunity, as it applied to such a case as this, as it did in 1911. Our original Civil Code of 1872 codified a great part of the then common-law rules. (*Cf.* Civ. Code, § 5.) The Legislature clearly had power thereafter to modify that statutory immunity, upon terms prescribed by it, as it did in 1923, when it adopted the Public Liability Act. It has been held that this act, by implication, repealed Streets and Highways Code, section 5640 (*Ackers* v. *City of Los Angeles,* 40 Cal.App.2d 50, 53 [104 P.2d 399]; *Jones* v. *City of South San Francisco,* 96 Cal. App.2d 427, 429-433 [216 P.2d 25]). Since courts cannot repeal statutes, the conclusion follows that *Muskopf* has not modified, amended, or repealed the Public Liability Act or any part thereof.

It might be argued under the orthodox but unrealistic theory of the older writers, that the courts do not "make" law, but only "find" or "expound" it, that the cases overruled in *Muskopf* never were the law, and the Muskopf rule always was the law. (See *Allen* v. *Allen,* 95 Cal. 184, 198 [30 P. 213, 16 L.R.A. 646]; *Alferitz* v. *Borgwardt,* 126 Cal. 201, 208-209 [58 P. 460].) It requires some rather special mental gymnastics to apply such a theory, and the Muskopf opinion does not purport to apply it; on the contrary, it purports only to discard the old rule in favor of a new one. But, only for the sake of the argument, let us apply the theory. It would mean that there was no governmental immunity from tort liability in 1911. It would follow that the Legislature *created* such immunity in cases such as this when it adopted the Improvement Act of 1911. Thus we would have a *legislatively created* governmental immunity, repealed by the Legislature, in the Public Liability Act but by an act which sets forth the terms upon which the immunity was removed, and which the plaintiff must meet if he is to recover. Nothing in *Muskopf* suggests that the Legislature has no power to act as it has. The mere fact that the Legislature, in adopting a statute, may

have been mistaken in its belief that a certain rule of common law existed is no basis for denying its power to act or the validity of its enactment. (*Cf. Max Factor & Co.* v. *Kunsman,* 5 Cal.2d 446, 454-455 [55 P.2d 177]; *Butterworth* v. *Boyd,* 12 Cal.2d 140, 146 [82 P.2d 434, 126 A.L.R. 838]; *Smith* v. *Union Oil Co.,* 166 Cal. 217, 224 [135 P. 966].)

It has been held in this state, from the very earliest times, that the Legislature has all the powers of the British Parliament, subject only to such limitations as are expressly imposed by the Constitution which does not *grant* power to the Legislature, but merely limits it. (*People* v. *Coleman,* 4 Cal. 46, 49 [60 Am.Dec. 581]; *MacMillan Co.* v. *Clarke,* 184 Cal. 491, 496-497 [194 P. 1030, 17 A.L.R. 288]; *Collins* v. *Riley,* 24 Cal.2d 912, 915-916 [152 P.2d 169].) We know of no provision of the Constitution that excludes the power of the Legislature to act as it has in the field of the liability of governmental agencies to private individuals.

The conclusion would have to be the same even if the Improvement Act of 1911 had never been on the books. Whether the Legislature, when it adopted the Public Liability Act in 1923, was creating a liability, with conditions attached, or was attaching conditions to an existing liability, there can be no doubt that it had power to do so.

The judgment and orders appealed from are reversed.

Bray, P. J., and Tobriner, J., concurred.