[Civ. No. 10876. Third Dist. Nov. 9, 1964.]

LARRY FLOURNOY, a Minor, etc., et al., Plaintiffs and Appellants, v. THE STATE OF CALIFORNIA et al., Defendants and Respondents.

P. M. Barceloux, Burton J. Goldstein, Goldstein, Barceloux & Goldstein and Reginald M. Watt for Plaintiffs and Appellants.

Harry S. Fenton, Robert F. Carlson, Kenneth G. Nellis and Gordon S. Baca for Defendants and Respondents.

PIERCE, P. J.—Plaintiffs, the heirs of Cherre Flournoy, deceased, appeal from a judgment following the sustaining of the State of California's demurrer without leave to amend their wrongful death complaint.

The complainants' cause of action against the state was based upon an alleged dangerous and defective condition of a highway. The accident happened on November 14, 1955; the complaint was filed February 27, 1956. The eight and a half years between the latter date and the present are to be accounted for by the metamorphic processes of the development of the law of governmental tort liability: pre-*Muskopf*,* through *Muskopf*, through the 1961 "moratorium" legislation, to reach the goal—trustfully (but perhaps naively) hoped to be ultimate—of the 1963 legislation. (Gov. Code, § 810 et seq., Stats, 1963, ch. 1681.)

Complex issues have been argued: (1) Does the 1963 legislation violate due process and equal protection, whether applied prospectively or retrospectively? (2) If it is constitutional when applied prospectively, can it also be applied retroactively? (3) Did the complaint state a cause of action under the rule of *Muskopf*? (4) Does the complaint state a cause of action under the 1963 legislation? (5) If it does not, could it have been amended to state one, to the end that the court prejudicially erred in sustaining the state's demurrer without leave to amend?

We have concluded that the 1963 legislation is constitutional; that the complaint, although inadequately framed presently, might be amended to state a cause of action both under the 1963 legislation (Stats. 1963, ch. 1681) in its chapter 2 "Dangerous Conditions of Public Property" (Gov. Code, §§ 830-840.6) and under the common law of tort liability sans governmental immunity (as abrogated by *Muskopf*); that the trial court erred prejudicially in sustaining the state's demurrer. These conclusions require reversal.

Our discussion of the question of the constitutionality of the 1963 legislation, having general application, will precede consideration of the appeal on the facts pleaded. This appeal, as we stated in *Ferreira* v. *Barham* (Oct. 1964) *ante*, p. 128

---

*Throughout this opinion we refer to *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457], as "*Muskopf*."

[40 Cal.Rptr. 739], is one of a series of three appeals now before this court[1] where plaintiffs, all represented by the same firm of attorneys, contend that the 1963 governmental tort liability legislation is unconstitutional.

In *Ferreira, supra,* we answered the contention (also raised by the same counsel) that California's guest law violated due process and equal protection. ■ There we stated (on p. 130) the rule that "the Legislature may constitutionally alter, modify or eliminate prospectively common law rules governing private tort liability where it acts reasonably upon the basis, and within the scope, of its regulatory police power."

■ There are even more compelling reasons why the Legislature must be conceded that power where the liability for torts affected is not private but that of governmental agencies. As Professor Van Alstyne (research consultant of the California Law Revision Commission) says in 5 California Law Revision Commission Reports (1963) Sovereign Immunity Study, page 516: "Putting to one side the problem of retrospective application, there can be little doubt that the Legislature constitutionally may alter, modify or eliminate the common law rules governing tort liability for public entities, provided, of course, that such legislation does not violate constitutional restrictions against arbitrary classification."

■ It is also stated on page 516 that: ". . . [T]he multivarious differences between public entities and private individuals (including corporations) preclude any effective contention that legislative distinctions favoring public entities in matters of tort liability would be arbitrary."

■ In a footnote to the foregoing statements, this author says (*op. cit.*, p. 516, fn. 5) : "It appears to be settled that for tort liability purposes governmental entities may reasonably be classified differently from private persons, see *Dias* v. *Eden Township Hospital Dist.* (1962) 57 Cal.2d 502 [20 Cal.Rptr. 630, 370 P.2d 334] ; *Powers Farms, Inc.* v. *Consolidated Irr. Dist.* (1941) 19 Cal.2d 123 [119 P.2d 717] ; *Von Arx* v. *City of Burlingame* (1936) 16 Cal.App.2d 29 [60 P.2d 305], and that all types of public entities need not be classified alike or exposed to identical tort responsibility. See *Bosqui* v. *City of San Bernardino* (1935) 2 Cal.2d 747 [43 P.2d 547] (holding Public Liability Act valid notwithstanding fact that it imposed tort liability upon cities, counties and school districts but not upon State or other public entities)."

---

[1] The others are: *Hayes* v. *State of California,* 3 Civil No. 10916, and *Morgan* v. *County of Yuba,* 3 Civil No. 10636. They have not yet been reached for decision.

We agree with those statements. Indeed, it would seem almost an absurdity to argue that the Legislature, within its regulatory police powers, can change common law rules prospectively affecting *private* litigants but cannot do so when a governmental entity is involved. This would be particularly strange in the retrospective view of the long history of governmental-liability-case-law wherein the power of legislatures so to act has not only been asserted repeatedly but such power (before *Muskopf*) has been sometimes said to be *exclusive*. And *Muskopf* certainly does not hold that the Legislature must abdicate all its power in this very important field of police regulation. In fact it conceded that, although governmental immunity as a matter of substantive law was originally court-made and therefore could be (and was) court-unmade, the Legislature still had procedural control in granting and withholding consent to suit. The California Constitution (art. XX, § 6) expressly grants such control to the Legislature. To hold that the Legislature is powerless to legislate regarding substantive common law liability of public entities while possessing power over all *remedies* would be an astonishing anomaly.

This is not to say that because the Legislature has power to give or withhold its consent to be sued, it must also possess *unlimited* power to grant or deny all public entity liability for torts. As in the case of legislation affecting the common law rights of private individuals it must, if it is to withstand scrutiny on constitutional grounds, be in reasonable furtherance of some public purpose. Justice Traynor, speaking generally, in *Muskopf, supra,* on page 216, stated: "Public convenience does not outweigh individual compensation." But that statement does not mean, as appellants would have us construe it, that no policy considerations can justify legislative action affecting the tort liability of public entities. In fact, *Muskopf* tacitly recognizes such legislative power. In its justification of court-made policy on governmental liability it pointed out (on p. 218): "We are not here faced . . . with a comprehensive legislative enactment designed to cover a field." (See also *Thelander* v. *Superior Court* (1962) 58 Cal.2d 811, 814 [26 Cal.Rptr. 643, 376 P.2d 571].)

With the 1963 legislation California courts now ARE "faced with a comprehensive legislative enactment designed to cover a field." Appellants, having examined this legislation, characterize it as abolishing "all common law or judicially declared forms of liability for public entities without providing

any substitute form of redress.'' Our own characterization, following our study of the new law, is quite different. In fact, as regards the facts, appellants state they expect to prove (see *infra*) the 1963 legislation does not abolish common law liability for public entities. On the contrary, as will be developed below, it essentially codifies common law rules (with some modifications to be noted) and gives statutory approval to the *Muskopf* rule abrogating sovereign immunity.

Preliminary to a review of the provisions of the new law applicable, we now state the allegations of the complaint against which the law is to be applied.

In the first cause of action after an allegation that ''California State Highway #99, at or near Clear Creek Bridge, in Shasta County, California, was, and is, a public highway'' and that it is ''under the maintenance, care and control of the State of California, and the Department of Public Works, and the Division of Highways thereof,'' and of named officers and employee defendants, it is further alleged: ''At all times herein mentioned defendants . . . so negligently maintained said Clear Creek Bridge at said place, as to cause a dangerous and defective condition to exist, namely, that moisture would condense on said bridge and, in freezing weather would freeze thereon, causing a sheet of ice to form on the roadbed of said bridge and over which decedent on November 14, 1955, drove a 1952 Plymouth automobile . . . and was thereby caused to go into a skid'' as a result of which her car was struck by a cargo truck and trailer owned by defendant OREGON-NEVADA-CALIFORNIA FAST FREIGHT, INC.[2] Also alleged is the claim that the state and its officers had both actual and constructive knowledge and notice of the dangerous condition which was directly attributable to work done ''by or under the direction of each of said defendants in a negligent, careless and unworkmanlike manner''; that said defendants ''had authority and it was the duty of such defendants, to remedy such condition or post adequate warning thereof'' and that ''funds for that purpose were immediately available to them'' but that they ''failed to do so.'' It is also alleged that ''decedent was using said public property in a careful and prudent manner, and was exercising due care.'' Due service and filing of a claim for damages were also alleged. Further facts which plaintiffs assert an ability to prove are set forth hereinafter (see *post*, pp. 537-538).

---

[2] A second cause of action was alleged against the truck company and its operator. The fate of that cause of action in the history of this litigation has not been brought to our attention.

■ ■ The basic provision in the new legislation covering governmental liability for a dangerous condition of public property is Government Code section 835.[3] This section makes a public entity liable for injury proximately caused by a dangerous condition of its property at the time of the injury when the dangerous condition created a reasonably foreseeable risk of that type of injury. Negligence of a public employee acting within the scope of his employment, with actual or constructive notice by the entity for a sufficient time prior to the injury to permit a cure, are conditions of recovery.

The comment of the California Law Revision Commission (4 Cal. Law Revision Com. Rep. (1963) p. 854) regarding this section is useful in construing legislative intent. It says that the section is based upon the Public Liability Act of 1923 (former Gov. Code, § 53051) but extends liability, previously limited to cities, counties and school districts, to the state and other public entities. It is pointed out in said comment that liability does not necessarily exist if the evidentiary requirements of section 835 are met. Under new Government Code section 835.4 (to be discussed below) other defenses are given to the public entity.

Another provision of said chapter on "Dangerous Conditions of Public Property," regarding section 831, has particular application to the facts alleged in this complaint. That section reads: "Neither a public entity nor a public employee is liable for an injury caused by the effect on the use of streets and highways of weather conditions *as such.* Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such effect if it would not be reasonably apparent to, and would not be anticipated by, a person exercising due care. For the purpose of this section, the effect on the use of streets and highways of weather conditions includes the effect

---

[3]Government Code section 835 provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

of fog, wind, rain, flood, ice or snow but does not include physical damage to or deterioration of streets and highways resulting from weather conditions.'' (Italics supplied.)

The Law Revision Commission comment regarding this section (*op. cit.*, p. 852) is: ''This section may be unnecessary in view of the other provisions of this chapter setting forth the conditions of liability for dangerous conditions of public property. Nonetheless, it is included to forestall unmeritorious litigation that might be brought in an effort to hold public entities responsible for injuries caused by weather.''

The provisions of the new law which we have quoted above are, as we have stated, substantially a codification of that which might be stated to be the rules of the common law relating to the tort liability of public entities for a dangerous condition of public property in a majority of American jurisdictions (see 63 C.J.S., Municipal Corporations—Defects or Obstructions in Streets or Other Public Ways—At Common Law, § 782, p. 88 et seq.), and as embodied (applicable to cities, counties and school districts) in California's Public Liability Act, referred to above.

The exception in section 831 denying public entity liability for weather conditions ''as such'' (but with the exception to the exception that such entities were not exonerated ''from liability for injury proximately caused by such effect if it would not be reasonably apparent to, and would not be anticipated by, a person exercising due care'') was not novel legislation. It too expressed a rule of the common law. (See 63 C.J.S., Municipal Corporations, § 813, p. 144 et seq.; Notes 13 A.L.R. 17; 27 A.L.R. 1104; 61 A.L.R.2d 425.)

The portion of the 1963 legislation thus far discussed but codifies rules of common law tort liability for the dangerous condition of property and no question of unconstitutionality could arise, whether the provisions be applied prospectively or retroactively, were these sections the only ones involved. (See *Teall* v. *City of Cudahy,* 60 Cal.2d 431, 432 [34 Cal.Rptr. 869, 386 P.2d 493].)

■ One section of the 1963 legislation, however, cannot be said to be merely a codification of existing law. We refer to section 835.4.[4] This section provides that a public entity

---

[4]Section 835.4 of the Government Code provides as follows:

''(a) A public entity is not liable under subdivision (a) of section 835 for injury caused by a condition of its property if the public entity establishes that the act or omission that created the condition was reasonable. The reasonableness of the act or omission that created the con-

may absolve itself from liability for creating or failing to remedy a dangerous condition by showing that, after weighing potential risk of harm against cost to the public of remedial action, it would have been impractical for the public entity to have done anything else.

The Legislature's reason for including this provision is set forth in the Law Revision Commission comment (*op. cit.*, p. 857) : "This defense has been provided public entities in recognition that, despite limited manpower and budgets, there is much that they are required to do. Unlike private enterprise, a public entity often cannot weigh the advantage of engaging in an activity against the cost and decide not to engage in it. Government cannot 'go out of the business' of governing. Therefore, a public entity should not be liable for injuries caused by a dangerous condition if it is able to show that under all the circumstances, including the alternative courses of action available to it and the practicability and cost of pursuing such alternatives, its action in creating or failing to remedy the condition was not unreasonable."

This is a policy declaration by the Legislature. It applies legislatively expressed criteria to the "reasonable man" test which fixes the boundary between negligence and nonnegligence, criteria to be used when an alleged dangerous condition of public property is the issue.

We regard this to be a reasonable exercise of the police power and, so regarded, there can be no doubt of the constitutionality of the section against the charge that it violates due process and equal protection, at least where the law is given prospective application. (See *Kotronakis* v. *City & County of San Francisco*, 192 Cal.App.2d 624, 632 [13 Cal. Rptr. 709].) The same is true of the other provisions

dition shall be determined by weighing the probability and gravity of potential injury to persons and property foreseeably exposed to the risk of injury against the practicability and cost of taking alternative action that would not create the risk of injury or of protecting against the risk of injury.

"(b) A public entity is not liable under subdivision (b) of section 835 for injury caused by a dangerous condition of its property if the public entity establishes that the action it took to protect against the risk of injury created by the condition or its failure to take such action was reasonable. The reasonableness of the action or inaction of the public entity shall be determined by taking into consideration the time and opportunity it had to take action and by weighing the probability and gravity of potential injury to persons and property foreseeably exposed to the risk of injury against the practicability and cost of protecting against the risk of such injury."

of the "Dangerous Conditions of Public Property" chapter discussed above. We so hold.

But that conclusion does not solve the problem of the applicability of the 1963 legislation to the facts of this case.

The 1963 legislation (Stats. 1963, ch. 1681) by section 45 thereof provides *inter alia*:

"(a) This act applies retroactively to the full extent that it constitutionally can be so applied."

We turn then to the question whether here the new code sections can, constitutionally, be enforced retroactively. The problem should be approached with a background of the particular facts here present.

As stated above, the accident happened November 14, 1955; complaint was filed February 27, 1956. The *Muskopf* decision became final February 27, 1961. At the time the accident occurred and during the period of five-years-plus thereafter, no then-recognized cause of action existed against the defendant State of California. A general demurrer pressed by said defendants during that period would have resulted in a judgment of dismissal. The 1961 moratorium legislation (Stats. 1961, ch. 1404) became effective September 15, 1961. Its effect was to "freeze" all pending litigation in which the doctrine of governmental immunity was an issue, and its purpose as expressed by our Supreme Court in *Corning Hospital Dist.* v. *Superior Court*, 57 Cal.2d 488, 495 [20 Cal.Rptr. 621, 370 P.2d 325], was to "give the Legislature time to review the many statutory provisions enacted on the basis of the law existing prior to 1961, and determine what, if any, legislation may be necessary in this field."

In *Jones* v. *City of Los Angeles* (April 1963) 215 Cal. App.2d 155 [30 Cal.Rptr. 124] (hearing by Supreme Court denied) it was held (on pp. 156-157) that the *Muskopf* decision was authority for the proposition that a cause of action for assault of plaintiff by police officers occurring (September 17, 1960) before *Muskopf* (February 27, 1961) was a "vested right of which [plaintiff] could not be constitutionally deprived by subsequently enacted legislation." (The legislation referred to was the 1961 moratorium act (Civ. Code, § 22.3). The 1963 legislation had not been adopted when the *Jones* case was decided.)

Our question narrows to the determination of whether Government Code section 835.4 can be said to deprive plaintiffs here of a vested right.

First of all, use of the term "vested right" as a term

of approach to problem settlement is not helpful. The term is "conclusory." "[A] right is vested when it has been so far perfected that it cannot be taken away by statute." (See Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation* (1960) 73 Harv.L.Rev. 692, 696, 698.) It is said in *Miller* v. *McKenna*, 23 Cal.2d 774, 783 [147 P.2d 531]: ". . . [A] vested right, as that term is used in relation to constitutional guaranties, implies an interest which it is proper for the state to recognize and protect, and of which the individual may not be deprived arbitrarily without injustice. The question of what constitutes such a right is confided to the courts."

The courts have not exercised that entrusted power to declare that legislation modifying (or even wiping out) existing rights is always invalid. (See citations, *infra.*) There has not even been uniformity of decision under the same facts. (See, e.g., instances noted and cases cited, Bryant Smith, *Retroactive Laws and Vested Rights* (1927) 5 Texas L.Rev. 231, 237-240.) In California, in 1930, in *Callet* v. *Alioto*, 210 Cal. 65 [290 P. 438], the Supreme Court denied retroactive application to the then new California "guest law" but in so doing made a distinction between statutes retroactively affecting common law rights and those affecting rights based upon statute, the court saying the former were "vested" but stated on pages 67-68: "[A]ll statutory remedies are pursued with full realization that the legislature may abolish the right to recover at any time." (Citing Pol. Code, § 327, now Gov. Code, § 9606.) Other cases holding statutory rights to be "unvested" and common law rights to be "vested" have been collected by Professor Van Alstyne. (*Op. cit.,* pp. 526-527.) In *Krause* v. *Rarity*, 210 Cal. 644, [293 P. 62, 77 A.L.R. 1327], a wrongful death case, it was held that the then newly enacted guest law was not intended to have retroactive application. As dictum, however, the court asserted (on p. 654) that *had the law been intended to apply to causes of action already accrued at the time of enactment*, "the legislature would have been unrestrained by constitutional barriers" from abrogating the right of recovery, because a cause of action for wrongful death is statutory.

Here too a wrongful death action is involved, and since, in California, responsibility for defective public property rests upon statute, liability might be said to be statutory in a double sense. But resting decision upon the distinction between statutory and common law rights is neither justified

by reason nor rule. The distinction is based upon rickety reasoning because persons act no more nor less in reliance upon established rules of the common law, or in expectation that they will remain unchanged, than they do upon statutes. In *Wells Fargo & Co.* v. *City & County of San Francisco,* 25 Cal.2d 37 [152 P.2d 625], the court, without making any distinction between rights based upon statute and those based upon common law, held that a retroactive statute purporting to command a mandatory dismissal of action pending five years (Code Civ. Proc., § 583) could not constitutionally be applied to cut off a statutory tax refund action. Also in *Wexler* v. *City of Los Angeles* (1952) 110 Cal.App.2d 740 [243 P.2d 868] (hearing by Supreme Court denied), a wrongful death action brought under the Public Liability Act (and therefore doubly dependent upon statute), it was held that a statutory amendment requiring that the natural father, although divorced, be joined as a plaintiff to a wrongful death action could not apply to a cause of action accrued when the statute was enacted since ''it is not within the power of the Legislature to impair such vested right''—that such would be a violation of due process.

Legal writers, studying the ''multivarious'' cases in which the problem of constitutional versus unconstitutional retroactivity has been considered, have frequently sought some formula by which the question can be determined. Their study has included both cases where the retroactive legislation affected preexisting contracts and causes of action sounding in tort (and the two from the standpoint of our problem here are treated as being indistinguishable.) Unanimously, it seems, the conclusion has been reached that *no definitive rule is possible.* (See, e.g., Bryant Smith, *op. cit.,* pp. 247-248; W. David Slawson, *Constitutional and Legislative Considerations in Retroactive Lawmaking,* 48 Cal.L.Rev. 216, 251; Hochman, *op. cit.,* p. 696; Robert L. Hale, *The Supreme Court and the Contract Clause: III,* 57 Harv.L.Rev. 852, 872-892.) And we can find none stated in the cases examined. Each decision, however, appears to rationalize its asserted rule on some basis and these bases are susceptible to statement in terms of policy factors, the expression of which by Mr. Hochman (*op. cit.,* p. 697) we accept as workable: ''. . . These factors are: the nature and strength of the policy interest served by the statute, the extent to which the statute modifies or abrogates the asserted preenactment right, and the nature of the right which the statute alters.''

In discussing the first factor, among a number of cases considered is *Home Bldg. & Loan Assn.* v. *Blaisdell*, 290 U.S. 398 [54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481]), upholding the Minnesota Mortgage Moratorium Law, born of the depression, which extended mortgage redemption periods and permitted the owner to remain in possession upon payment of reasonable rentals. The United States Supreme Court (per Chief Justice Hughes) held that the law was neither an impairment of contract nor a violation of due process nor of equal protection; that it was a valid exercise of the police power having for its justification a serious emergency. That case typifies an instance where "strength of policy interest served" was a factor strongly to be weighed in favor of a ruling of constitutional retroactivity. (See comment on *Blaisdell* in *Corning Hospital Dist.* v. *Superior Court, supra,* 57 Cal.2d 488, 495.)

The factor entitled "the extent to which the statute modifies or abrogates the asserted preenactment right" includes distinctions sometimes made by the courts between statutes affecting remedies and those affecting rights. Of course, the removal of all, or substantially all, of an individual's remedies for enforcing a right would have the same practical effect as destroying the right itself. "Remedies are the life of rights." (See Bryant Smith, *op. cit.,* p. 242, quoting Justice Bradley in *Campbell* v. *Holt*, 115 U.S. 620, 631 [6 S.Ct. 209, 29 L.Ed. 483, 488].) But there are many instances (and we believe the case at bench is one of them) where the statute restricts the preenactment rights to a lesser degree and a court will consider the extent of such restriction in the weighing of all factors. Effectually this was done by the United States Supreme Court in *Home Bldg. & Loan Assn.* v. *Blaisdell, supra.* It was also the basis of our Supreme Court's holding, in *Corning Hospital Dist.* v. *Superior Court, supra,* 57 Cal.2d 488, that the moratorium legislation was constitutional.

The third factor, "the nature of the right which the statute alters," has reference to the degree to which a right has been, and could be, asserted and enforced, prior to the enactment of the statute. In this category there is to be considered the element of "reliance," "expectation" and "surprise." In fact it has been asserted by some writers that it is upon the sole question of whether or not there has been reliance upon, or the reasonable expectation of the continuance of, preexisting law that constitutionality of retroactive legislation *de-*

534

*pends.* (See: Ray A. Brown, *Vested Rights and the Portal-to-Portal Act* (1948) 46 Mich.L.R. 723, 746, 752-753.) Apropos this discussion are the so-called "windfall" cases referred to by Professor Van Alstyne (*op. cit.*, p. 533) although the term, perhaps, has unfortunate connotations.

Illustrative of the effect to be given the factor now under discussion, in fact to all three factors, is *Moss* v. *Hawaiian Dredging Co.* (9th Cir. 1951) 187 F.2d 442. There certain "walking bosses and warehousemen" sued their employers for overtime compensation in 32 actions. The actions were predicated upon plaintiffs' interpretation of a section of the Fair Labor Standards Act which they alleged should be construed (effectually) to allow overtime on overtime. While the actions were pending the Portal-to-Portal Act of 1947 was enacted by Congress. After trial, but before decision, the United States Supreme Court in *Bay Ridge Operating Co.* v. *Aaron*, 334 U.S. 446 [68 S.Ct. 1186, 92 L.Ed. 1502], upheld plaintiffs' contentions as to how overtime should be computed. Thereafter (and still before judgment) Congress passed Public Law 177, popularly known as the "Overtime-on-overtime" Act in which the contentions of the defendant employers in the pending litigation as regards the proper construction of the plaintiffs' rights under their contract with the employers were sustained. The provision was made retroactive. The court in the *Moss* case (per Judge Pope) held that retroactive application of the new law was not a violation of due process.

Except that private entities only were there involved the *Moss* case is not dissimilar to the case at bench.[5]

▮▮▮ We now apply these policy factors to the case before us, discussing each separately and then weighing them together to reach a decision on this question. We consider first the nature and strength of the public interest served by the 1963 legislation.

No one will quibble that *Muskopf* and its companion, *Lip-*

[5]The distinction—the fact that here we deal with the modification of an individual's right against the state, has been made the basis of differentiation (in favor of the former) in some cases. (See e.g., *Norman* v. *Baltimore & Ohio R.R. Co.*, 294 U.S. 240 [55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352].) However, these cases usually have been "contract impairment" cases where the "immorality" and obvious unfairness which attach to legislative abrogation of preexisting contracts solemnly entered into were involved. In cases involving the state's tort liability under the circumstances present here, the sense of shocking immorality disappears. In fact, it would seem the Legislature should be "given greater leeway in modifying rights against the government because of the public interest in the smooth functioning of the government." (See: Hochman, *op. cit.*, p. 723.)

*man* v. *Brisbane Elementary School Dist.,* 55 Cal.2d 224 [11 Cal.Rptr. 97, 359 P.2d 465], brought problems of magnitude to governmental administration. The Supreme Court recognized this in its discussion of the moratorium legislation of 1961 in *Corning Hospital Dist.* v. *Superior Court, supra,* 57 Cal.2d 488.

As we pointed out in *Ferreira* v. *Barham, supra, ante,* at page 135, the common law is not static. Yet in California in the field of governmental tort liability (except in the instances where it had attained some measure of fluidity by legislative enactment), it had remained so for more than a hundred years, this because the doctrine of governmental immunity had been so firmly fixed that there had been no opportunity to apply common law principles. If *Muskopf* had been decided in the early period of our state's history, growth of case-made common law as applied to tort liability of public entities could have kept pace with the growth and complexity of the problems of these agencies. When in 1961 the shield of governmental immunity was abruptly removed, California apparently being the pioneering state in this regard, a problem of immediacy was presented. There had been a century-long gradual whittling away of various immunities, some through legislative enactment (e.g., Public Liability Act of 1923), same through case law (e.g., the "public nuisance" extension —see *Vater* v. *County of Glenn,* 49 Cal.2d 815 [323 P.2d 85]) all aimed at the same goal—but leisurely paced. When suddenly the goal was attained by *Muskopf,* the decision as stated in the *Corning Hospital* case, *supra,* 57 Cal.2d at page 496: "inevitably . . . had far-reaching consequences" and the court in *Corning* (on p. 495) recognizes that legislative review of the many statutory provisions enacted on the basis of pre-existing law and perhaps new legislation would be necessary. The 1963 legislation, a product of the California Law Revision Commission, its research consultant Professor Van Alstyne and its staff, is the result. Its very comprehensive scope is itself proof of the magnitude of the job of bringing the gears of governmental administration into mesh with the modern common law rules of tort liability in compliance with the mandate of *Muskopf.*

The great public interest served by the performance of this task cannot be gainsaid; nor do we believe that the giving of retroactive application to the accomplishments of the Legislature is not a ponderable consideration. True, if the legislation were to be given only prospective operation, statutes of

limitation have, as regards unfiled claims, already barred most actions and will shortly bar all. (Gov. Code, §§ 911.2, 911.4 and 912.) We have no statistics on the size of potential un-barred claims and complaints now pending, but even in the restricted field of tort claims for allegedly dangerous public property, when one considers the hundreds of thousands of miles of public roads and the countless numbers of other public properties, the exposure of public entities to liability under preexisting causes of action must be considered.

Government Code section 835.4 is, as stated above, the only provision of the chapter, "Dangerous Conditions of Public Property" (Gov. Code, § 830 et seq.) which modifies plain-tiffs' preexisting rights and is therefore the only one which must be considered in determining the constitutionality of retroactive application. In giving that consideration, and in weighing the factor of the strength of the public interest, we are impressed by the Law Revision Commission comment ap-pended thereto (quoted, *ante*, p. 529). It notes that govern-ment cannot "go out of . . . business." Unlike a private en-tity, it cannot quit building and maintaining highways and other public properties because of its exposure to liability for payment of damages for injuries suffered by individuals. Nor are its tax-raised funds inexhaustible.

We consider the next element: The extent to which the preenactment right has been affected. We point out that in this case the effect has not been great. Under the section we are discussing the limit of the relief given the public entity is provision for a defense against the cause of action if, and only if, it can sustain the burden of proof, satisfying the trier of fact that a failure to remedy the condition alleged to have caused injury was not unreasonable, applying the statu-tory test. As we see it, the Legislature in fixing this limita-tion was doing no more than establishing the *ground rules* under which a cause of action could be proved.

And lastly we consider the "nature of the right which the statute alters." We have shown above that under the common law, and disregarding the question of governmental immunity, liability of public entities in the field relevant to this case has always been extremely limited. And *because* of governmental immunity, reliance upon the preexisting right was nil—until *Muskopf*. To state the proposition that because the rule of *Muskopf* rejected the shield of governmental immunity retro-actively the shield never existed is to state arrant nonsense— when the statement is applied to an individual's expectations and the element of "surprise" which, as has been pointed out

above, is one of the principal bulwarks of the cases holding retroactive legislation to be invalid. (See *Kotronakis* v. *City & County of San Francisco,* 192 Cal.App.2d 624, 632 [13 Cal.Rptr. 709].) A right well recognized by common law may be said to be relied upon and the activities of individuals to be carried on in expectation of the continuation of the right so that its abrogation or even its modification is "surprise" legislation. But plaintiffs here acted with no such expectation or reliance.

Regardless of whether the rule of *Muskopf* may be properly characterized as a "windfall" it is certain that between the date of the accident, November 14, 1955, and the *Muskopf* decision no recognized cause of action existed.

Grouping together the three factors, upon the summation of which constitutional retroactivity depends, we find here legislation wherein public interest is great and such interest attaches importantly to its retroactive application. We weigh this against a right which has not been, in our estimate, grievously impaired. And also, as a part of the weighing process, we deal with a right which only existed through the retroactive application of *Muskopf*. The result of this weighing tips the scales to require our decision that the legislative declaration of retroactivity (Stats. 1963, ch. 1681, § 45) is not unconstitutional—as applied to the facts and provisions of the 1963 legislation here involved.

██ This determination does not dispose of the appeal. We have still to consider whether the complaint states a cause of action under the new statute. The complaint has infirmities as a pleading; almost inevitably so since the 1963 legislation was not in existence when it was drafted. It could have been amended after enactment and plaintiffs did not seek to amend. Defendants point to this and urge that application to amend comes too late on appeal. Under the circumstances here existing we do not think so. The trial court rested its decision upon the ground that the 1963 legislation could "be applied retrospectively." It was clearly assumed by the court (and seems to have been assumed by the argument of counsel on both sides) that *no* cause of action could be pleaded under the 1963 legislation. It was evidently considered that plaintiffs had merely pleaded an accident due to weather conditions, towit: an icy pavement "as such." In our view more than this is involved. In addition to facts which were set forth in the complaint, counsel for plaintiffs assured this court during oral argument that plaintiffs expect to prove that the highway bridge where the accident happened as maintained "was like

a basin which collected water for freezing," that other accidents had occurred there, that highway officials had knowledge of the conditions and had had complaints and demands for correction.[6] From this we conclude that there is a possibility that ultimate facts, including those necessary to meet the conditions of the 1963 legislation which we have quoted and discussed above, could have been pleaded, and that plaintiffs should have an opportunity to do so.

Whether plaintiffs will be able *actually* to plead and prove facts which will bring them within the exception to Government Code section 831 (exonerating public entities from liability for weather conditions as such) we express no opinion. Nor do we have facts before us sufficient to express an opinion concerning, or even to discuss, what effect, if any, the "plan or design" provision (Gov. Code, § 830.6) may have on this litigation.

The judgment is reversed and the cause remanded for further proceedings in accordance with the views expressed herein.

Friedman, J., and Van Dyke, J.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 6, 1965.

---

[6]The following excerpt is a transcript of the pertinent portion of oral argument on appeal:

"Mr. Goldstein [Attorney for Appellants]: The Flournoy case is a case in which it was alleged that a bridge in Shasta County was negligently maintained so that a sheet of ice was caused to form upon it. The state knew about it or should have known about it and then follows an allegation which is not mentioned in respondents' brief, but which I will point out specifically, namely that the state, having knowledge, failed to warn others of the dangerous condition. . . . With the exception of the sovereign immunity bar, such as existed in the Bettencourt case, it was argued and assumed by everyone, including the state, that we had stated a cause of action for a dangerous and defective condition of a highway.

"Justice Friedman: Caused by the weather.

"Mr. Goldstein: In part. Now there I would have to go into some factual situations too because the complaint unfortunately doesn't disclose the fact, for instance, that the California Highway Patrol had complained and demanded that the state rebuild the bridge that in effect was like a basin which collected water for freezing, that there were other accidents of which they had knowledge, that they had put sand on it which was wholly ineffective to do this. But the court will have in mind that our complaint was framed long before *Muskopf* even. But aside from that it was considered by everyone that if sovereign immunity was not a problem that then we had stated a cause of action against the State of California."

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.