[Civ. No. 313. Fifth Dist. Aug. 27, 1964.]

ELIZABETH ANNE CHAVEZ, a Minor, etc., et al., Plaintiffs and Appellants, v. COUNTY OF MERCED, Defendant and Respondent.

Kane, Canelo & Mash, A. B. Canelo and Cyril Viadro for Plaintiffs and Appellants.

McCormick, Barstow, Sheppard, Coyle & Best and William B. Boone for Defendant and Respondent.

CONLEY, P. J.—In this action brought by his widow and children for the death of David A. Chavez, the appeal is from a judgment of nonsuit. This being so, we must apply well known rules in considering the record and the briefs of the parties. ■ Therefore, all evidence which favors the plaintiffs, including beneficial presumptions and inferences, must be taken as true. ■ The lower court has no right to grant a nonsuit if there is any substantial evidence which, if believed by the triers of fact, would make out a case for plaintiffs. (*McCall* v. *Otis Elevator Co.*, 219 Cal.App.2d 22, 24-25 [33 Cal.Rptr. 44].) ■ An appellate court is forbidden in a case of this kind to weigh the evidence or to decide which of conflicting testimony is correct. We do not have a right to decide who should prevail on the facts of the case, but only whether the jury would be entitled to find from the evidence that the plaintiffs could recover, even though there is opposing evidence which, in the view of an appellate judge, might preponderate against the plaintiffs. In our system of jurisprudence the right of a party to have a jury decide the facts is so important that all legitimate considerations favor that function.

In considering this appeal, plaintiffs perhaps needlessly elected to restrict their claim for damages to the Public Liability Act. The judgment in the leading case of *Muskopf* v. *Corning Hospital Dist.*, 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457], became final on February 27, 1961, whereas the alleged cause of action in this case arose on August 11, 1961. Section 22.3 of the Civil Code was passed by the Legislature at the regular session of 1961 (Stats. 1961, ch. 1404, p. 3209) ; it declared a moratorium to enable the Legislature to determine whether and to what extent the governmental immunity

doctrine should be re-enacted or abandoned, but the statute declared that on the 91st day after final adjournment of the 1963 regular session of the Legislature an action could be brought "in the manner prescribed by law" on a cause of action arising between February 27, 1961, and the 91st day after adjournment, if a claim were filed in the matter, and such an action were not barred by any other law subsequent to the enactment of section 22.3 of the Civil Code (2 Witkin, Summary of Cal. Law, Torts, 1963 Supp., § 23B, pp. 64-65). The opinion in *Corning Hospital Dist.* v. *Superior Court,* 57 Cal.2d 488, 496 [20 Cal.Rptr. 621, 370 P.2d 325], decided that all cases which were based on general governmental liability for negligence should be continued for trial and not heard until at least 91 days after the 1963 adjournment, permitting the parties, however, to file pleadings and to take depositions in the meantime; such causes of action were merely suspended and not destroyed. However, the plaintiffs in this case elected to go forward with the trial during the moratorium period and they reiterated specifically that they were relying wholly on the Public Liability Act.

The *Muskopf* decision did not alter or amend the Public Liability Act (*Kotronakis* v. *City & County of San Francisco,* 192 Cal.App.2d 624, 631 [13 Cal.Rptr. 709]; in actions based upon it, the evidence has to comply with the conditions prescribed in that enactment (*Thon* v. *City of Los Angeles,* 203 Cal.App.2d 186, 189 [21 Cal.Rptr. 398]; *Kotronakis* v. *City & County of San Francisco, supra,* 192 Cal.App.2d 624; *Akers* v. *City of Palo Alto,* 194 Cal.App.2d 109, 122 [14 Cal. Rptr. 767]; *Ngim* v. *City & County of San Francisco,* 193 Cal. App.2d 138, 144 [13 Cal.Rptr. 849]). As in the *Akers* case, *supra,* the pleadings here were framed and the case tried and decided solely under the Public Liability Act and not upon any theory of general liability of the county for negligence, and it is too late on this appeal to proceed upon a new and different theory.

One August night in 1961, Mr. J. C. McClure was traveling north in his car on the Plainsburg road in Merced County toward the town of Planada behind another vehicle; he noticed that the automobile in front of him was weaving back and forth on the highway. Fearing to pass it, he followed the weaving car for 2 or 3 miles. Finally, it went off the east side of the road, came back across the road, and shot into the borrow pit on the west side of the highway, striking and breaking an electric power pole on the way. Mr. McClure saw

an electric wire fall, with a tremendous flash of blue light followed by flames in the dry grass at the side of the road; he drove past the car which had stalled just off the road after breaking the pole and hurried to the Merced County Fire Station in Planada where he spoke to the engineer on duty, Mr. J. O. Bradley, telling him, as he said, that he had seen a car hit an electric pole, that there had been a big blue flash of light, that the car was on fire, and that he should get out there without delay as there was a man in the car, also, that he should call his brother, who was a deputy sheriff in Merced, and have him cut off the electricity. Mr. Bradley on the contrary claimed that Mr. McClure had not told him that it was an electrical accident and fire, but we must take the testimony which favors the plaintiffs as being true for the purpose of passing on the nonsuit

Mr. Bradley, the engineer in charge of the fire station, sounded the alarm to call the volunteer firemen, wrote a notification of the location of the fire on the blackboard so that volunteer firemen, upon coming to the station, might know where the fire was located, started his truck, warmed up his radio, and notified the central fire station in Merced. Mr. Bradley did not notify the Pacific Gas & Electric Company. He proceeded to the location of the accident and there parked his truck so that the cab was almost in line with the rear end of the damaged car. There was a spotlight on the truck which Mr. Bradley did not turn on, and he did not use a movable hand light, also available in the truck, to make a comprehensive survey of the locality. Mr. Bradley stated that he did not know there was a man in the crashed automobile until after the electrocution of Mr. Chavez. He left the motor of his cab running and went around to the front of his truck to get the motor started on the pumping apparatus. Mr. Bradley found that Clifford Stofle, a volunteer fireman who had arrived at the scene and who had asked him for water pressure, already had the valve on. As Bradley opened the throttle, he noticed a human elbow through the door of the stalled car; he realized then that there was a man in the wrecked automobile. He said that he then also saw the broken pole and knew that a high tension wire was down.

Almost immediately after there was a flash, a big arc flash, when Chavez was killed. The decedent Chavez, whose family home was a short distance from the fire, had been helping Stofle and another man to get the hose in position to direct

water upon the burning grass and the stalled automobile. Chavez had possibly been asked by Stofle to help.

Mr. Bradley testified that had he known the fire was an electrical one, he would have warned everyone to stay back until the situation was sized up to see what danger was involved. He admitted that if he had been told that the car had hit a power pole and that there had been a big blue flash, that there were some wires down, and that he should call the P. G. & E., he would have immediately radioed central station that, ''We have power poles down, . . . notify the P. G. & E. Company.'' Bradley also said that if he had had that information he would have immediately set up some kind of warning system to keep people back until he found out what exactly the situation was. He also admitted that he would have used his portable electric lantern and that he would have inspected the scene immediately after arrival to determine where the downed pole was, and also where the live wire was located. Mr. Bradley testified that he was in full charge of the fire until a senior officer arrived.

Mr. Stofle, the first volunteer fireman at the scene, testified that when he heard the fire alarm, he got out of bed and went past the Planada station to the fire, which took him a minute, or a minute and a half; when he arrived, the grass was burning and the wrecked car had just started to burn; he started to pull a line of hose off the fire truck; David Chavez came up and proceeded to help him. (Gov. Code, § 204.) Stofle and Chavez pulled the hose about 50 feet to the rear of the truck; Stofle returned to the truck to turn on the valve; at the truck, he talked to Bradley; Chavez then told Stofle he could not turn the valve on the nozzle and Stofle went to help him operate it; Stofle turned the nozzle on and started toward the burning car; the nozzle was adjusted to generate a fog-like stream of mixed air and water; Stofle did not see the downed power pole or any wires on the ground; Chavez and Stofle proceeded toward the car for about 10 feet; when they struck the live wire, he was in front and Chavez was behind him; both men were knocked down by the heavy charge of electricity; Chavez died; Stofle recovered.

At the time of the accident, the Public Liability Act was contained in sections 53050 to 53056 of the Government Code. In 1963, the act was repealed by the Legislature (Stats. 1963, ch. 1681, p. 3286, § 18) due to the fact that, in the same session, the Legislature definitely enlarged the scope of tort liability of local agencies, including cities, counties, and school

districts, so that the area of liability formerly covered by the Public Liability Act was included in the new legislation. (Gov. Code, §§ 810-895.8; Stats. 1963, ch. 1681, p. 3266, § 1.)

Section 53050 of the Government Code at that time defined public property as covering a "public street, highway, building, park, grounds, works, or property," and the use of the term local agency was stated to include cities, counties, and school districts. The substantive provisions of the act were incorporated in section 53051 of the Government Code, which read as follows: "A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition:

"(a) Had knowledge or notice of the defective or dangerous condition.

"(b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition."

■ It will thus be seen that we must inquire whether or not the record contained evidence from which a jury might have concluded (1) that there was a dangerous condition of the street, (*Holder* v. *City of Santa Ana,* 205 Cal.App.2d 194, 197-198 [22 Cal.Rptr. 707]) (2) that the person authorized to remedy the condition had knowledge or notice of the dangerous condition, (3) that such person for a reasonable time after acquiring that knowledge or receiving notice failed to remedy the condition or to take action reasonably necessary to protect the public against the condition.

Clarence Harry Vaughn, the Merced County Fire Chief at the time of the accident, testified that Mr. Bradley was in full charge of the county unit at the Planada Fire Station, and that as such he had complete authority over all operations at a fire until a senior officer arrived at the scene, including directing the activities of the men, placing the fire truck in operation, and protecting life and property at the scene. The jury would have had a full right to find from the evidence that Mr. Bradley was the person authorized and required to remedy any dangerous condition of the public highway at or near the scene of the fire.

The witness McClure testified that he had told Mr. Bradley at the firehouse facts from which a jury could conclude that Bradley had timely knowledge that this was an electrical fire.

Is there any doubt that the jury could have found as a

fact that a live 11,000-volt wire in or at the edge of a public street or highway was a "dangerous condition"? (*Teall* v. *City of Cudahy,* 60 Cal.2d 431, 433, 434 [34 Cal.Rptr. 869, 386 P.2d 493].) Respondents apparently contend that the wire was at the edge of the highway and as automobiles usually use the portion of the right of way nearer the center of the street this was not a "dangerous condition" within the meaning of the code section. We expressly overrule this contention. For the public is entitled to walk upon or ride along any part of the public street or highway. (*Fackrell* v. *City of San Diego,* 26 Cal.2d 196, 208 [157 P.2d 625, 158 A.L.R. 773] ; *McLaughlin* v. *City of Los Angeles,* 60 Cal.App.2d 241, 245 [140 P.2d 416] ; *Randolph* v. *Hunt,* 41 Cal.App. 739, 743 [183 P. 358].)

Obviously, the county did not have the right or duty at any time to repair the pole line and substitute a new power standard or to mend the wire. That was for the Pacific Gas & Electric Company to do. The "dangerous condition," which concerned the county, was the state of the highway with an 11,000-volt loose wire more or less hidden at its edge. What had to be done by the county to reform the dangerous condition was (a) to give notice to the power company to shut off the current, or (b) to cut the high voltage wire at such a point as to eliminate the dangerous condition of the street, or (c) in the absence of ability to perform either of those acts to take steps to protect the public against the danger, including the giving of effective warning. In the fire truck which Mr. Bradley drove to the scene of the accident, there was a pair of wire cutters which was mechanically sufficient to cut the wire in question. That these wire cutters, of a kind carried in all of the county fire trucks, were mechanically adequate to sever the wire was demonstrated later that night, after the power had been shut off, when the wire was in fact cut with one of the instruments of this type and size. Several witnesses testified that in their opinion it would have been fatally dangerous to use these standard wire cutters because of the high current and that the "hot wire" could have been cut safely only with the superior wire cutters in the central office in Merced; however, the jury might have found that the wire cutters in the truck could have been used prior to the death of Mr. Chavez based on the testimony of one witness. Thus, although the weight of the evidence showed that it would have been unsafe to use such an instrument, it was for the jury to make the determination from all of the facts in evidence.

A telephone call to the Pacific Gas & Electric Company at Merced either directly or through the central fire station could have been effected easily from Planada by Mr. Bradley before he drove his truck to the fire. Mr. McClure testified that he suggested that such a call be made to the sheriff's office at Merced at the time he first reported the fire; while Mr. Bradley denied that any such information was given him, we must again take as true such of the conflicting evidence as favored the plaintiffs for the purpose of testing the legitimacy of the nonsuit.

Furthermore, section 53051 directed that a person having authority to remedy the dangerous condition of the streets, but who was not in a position to do so, should take reasonably necessary action to protect the public. The testimony in the record makes certain that he could have taken some such steps in the premises. The witness Lopez, a fire engineer, testified that an electrical fire is a different type than the ordinary conflagration and that as an engineer he would take special precautions at such a fire having ". . . great respect for hot wires,'' if he knew of the type of fire beforehand. He said that in such circumstances "we keep the people away''; that he would just talk to all those present and tell them to stay back and that he had the duty and right as engineer of the fire station to give such warnings. Mr. Vaughn, the chief of the county fire department, also testified that Mr. Bradley had authority to keep people away from the fire.

Mr. Bradley admitted on the stand that if the person in charge is informed that a power pole and live wire are down at the scene of a fire, he should radio that fact to the central fire station to be transmitted to the Pacific Gas & Electric Company so that the power could be shut off; in such event, when the engineer arrived at the fire he would devise some means of warning the public, and he would also make a full survey of the scene by the use of the movable flashlight. Not only did Mr. Bradley fail to ask that the power be shut off, but he did not use his lights to survey the field where the wire was down and the fire was burning; he took no measures to warn the public, or specifically Mr. Chavez, of the danger involved.

The fact that Mr. Jones, the drunken driver of the automobile which struck the pole, was originally at fault and that the death may be traced back to his negligence was no excuse for the negligence of the county, if it in fact existed. Merely because another person's wrongful actions are involved

does not excuse a county for a negligent failure to act under the terms of the Public Liability Act (*Irvin* v. *Padelford*, 127 Cal.App.2d 135, 141 [273 P.2d 539]; *Bauman* v. *City & County of San Francisco*, 42 Cal.App.2d 144, 154 [108 P.2d 989]).

The general principle that notice must be given to someone having the legal power to remedy the situation and not to a mere employee of a county is relied upon by the respondent; it contends that Mr. Bradley was a mere employee. But the respondent does not give proper weight to the uncontradicted testimony that Bradley had sole charge of the fire until some superior officer appeared on the scene. All of the events leading up to the death of Mr. Chavez occurred while Bradley was in full charge of the situation. There is some contention that notice had to be given to the Merced County Board of Supervisors, but this is not in line with the authorities or the wording of the code section itself. In *Bauman* v. *City & County of San Francisco, supra,* 42 Cal.App.2d 144, 153, notice to the superintendent and assistant superintendent and a director of playgrounds of the dangerous condition of the grounds was sufficient even though they were under the legal control of the Recreation Commission. The court said that the superintendent and assistant superintendent and the director in charge of the playground were not "mere employees" and that they had the power to remedy the dangerous condition, citing *Huff* v. *Compton City Grammar School Dist.*, 92 Cal.App. 44 [267 P. 918]; *Hook* v. *City of Sacramento*, 118 Cal.App. 547 [5 P.2d 643]; *Wise* v. *City of Los Angeles*, 9 Cal.App.2d 364 [49 P.2d 1122, 50 P.2d 1079]. In *Hawk* v. *City of Newport Beach,* 46 Cal.2d 213 [293 P.2d 48], it was held that notice to a swimming instructor who had charge of a public beach with respect to the dangerous condition of the area was sufficient notice to the city. (See also: *Teilhet* v. *County of Santa Clara,* 149 Cal.App.2d 305, 309-310 [308 P.2d 356]; *Wise* v. *City of Los Angeles, supra,* 9 Cal.App.2d 364, 367-368; *Dawson* v. *Tulare Union High School,* 98 Cal.App. 138, 142 [276 P. 424]; *Johnson* v. *County of Fresno,* 67 Cal.App.2d 116, 122 [153 P.2d 557].)

 If a person has the right and the ability to remedy the dangerous condition but cannot so act for some good reason, nevertheless he owes a duty to warn the public of the danger. In *Shea* v. *City of San Bernardino,* 7 Cal.2d 688, 693 [62 P.2d 365], the city, while not having authority to regulate the surfacing of a street at a railroad crossing, as the Railroad Commission had that exclusive right, still had a duty

to remedy the dangerous approach to the crossing by giving warning to the public of the situation. In *Rose* v. *County of Orange,* 94 Cal.App.2d 688 [211 P.2d 45], the Fourth District Court of Appeal held that even though a county did not have the right to remedy a dangerous situation in which automobile traffic from a road entered a highway without a continuation of the road on the opposite side of the highway, it still owed the duty to give notice to the public of the danger involved. (See also: *Sale* v. *County of San Diego,* 184 Cal. App.2d 785, 790-792 [7 Cal.Rptr. 756].)

The respondent depends in large measure upon the holding in *Hoel* v. *City of Los Angeles,* 136 Cal.App.2d 295 [288 P.2d 989], in which it was determined that a police officer was not a person authorized to remedy a defective traffic signal at a busy intersection, when by ordinance the county had specifically provided that the only agency which could repair or change such signals was the Board of Traffic Engineering Commissioners. The court was dealing with an appeal from an order granting a new trial and there is some language in addition by way of dictum that is not controlling here.

The upshot of our thorough examination of the record and the briefs is the conclusion that the trial court erroneously took away from the jury its function of determining the facts, and that accordingly there will have to be a new trial. We are not deciding, of course, whether the defendant is liable, but only that the jury could have found liability under the conflicting evidence. Upon retrial, there will be numerous issues for determination by the jury, including the question of whether or not Mr. Bradley received actual notice of the electrical nature of the fire, whether he had the time or the power to do anything about it, whether the elements of county liability were present, and whether the decedent was guilty of contributory negligence.

The judgment is reversed.

Stone, J., concurred.

A petition for a rehearing was denied September 23, 1964, and respondents' petition for a hearing by the Supreme Court was denied October 21, 1964.