[S.F. No. 23931. Nov. 21, 1979.]

DENNIS DUCEY et al., Plaintiffs and Appellants, v.
ARGO SALES COMPANY, Defendant and Respondent;
THE STATE OF CALIFORNIA, Defendant and Appellant.

708

COUNSEL

Claude W. Heavin and Richard Simmons for Plaintiffs and Appellants.

Robert E. Cartwright, Edward I. Pollock, Leroy Hersh, Stephen I. Zet-terberg, Robert G. Beloud, Arne Werchick, William P. Camusi, Richard D. Bridgman, Ralph Drayton, Leonard Sacks, Boccardo, Lull, Niland & Bell, Edward J. Niland, Michael G. Briski and Jack L. Slo-bodin as Amici Curiae on behalf of Plaintiffs and Appellants.

Harry S. Fenton, Richard G. Rypinski, John P. Horgan, Robert J. DeFea, Kenneth G. Nellis, Robert E. Brown, Thomas J. Brandi and Lee Tyler for Defendant and Appellant.

Burt Pines, City Attorney (Los Angeles), John T. Neville, Assistant City Attorney, and Daniel U. Smith, Deputy City Attorney, as Amici Curiae on behalf of Defendant and Appellant.

Robert E. Friedrich and Jay R. Mayhall for Defendant and Respondent.

Opinion

**TOBRINER, J.**—In February 1972, plaintiffs Patricia and Dennis Ducey were seriously injured when a car driven by Dolores Glass crossed a freeway median and collided head-on with their automobile; Glass was killed in the accident. Plaintiffs thereafter brought the instant action to recover damages for their injuries, naming as defendants, inter alia, the State of California, the estate of Dolores Glass, and Argo Sales Company (Argo Sales), Glass' employer. After a lengthy trial, the jury returned a verdict in favor of plaintiffs against the State of California and Glass' estate; the jury, however, absolved Argo Sales of any liability for plaintiffs' injuries.

Both the State of California and the plaintiffs appeal from the judgments subsequently entered in accordance with the jury verdicts. The state contends that the trial court erred in permitting plaintiffs' action against it to go to the jury, maintaining that the trial court should have ruled as a matter of law that the state's failure to provide a median barrier at the accident site could not subject it to liability for plaintiffs' injuries. Plaintiffs respond that the court properly left the question of the state's liability to the jury, but argue that the court erred in submitting Argo Sales' liability to the jury; plaintiffs assert in this regard that the evidence established as a matter of law that Glass was acting in the scope of her employment at the time of the accident and consequently conclusively demonstrated that Argo Sales was vicariously liable for plaintiffs' injuries.

As we shall explain, we believe that the trial court properly left the matter of both the state's liability and Argo Sales' liability to the jury for its resolution. Accordingly, we affirm the challenged judgments in all respects.

1. *The facts.*

Shortly before noon on February 28, 1972, Mark Hunter entered state route 17 (the Nimitz Freeway) at the northbound Thornton Avenue on-ramp in Fremont. Finding traffic halted in both northbound lanes, he noticed a pickup truck weaving erratically ahead of the backed up cars. Hunter and Terry Kelsey, another driver caught in the traffic jam, managed to halt the pickup by driving around it and forming a roadblock with their vehicles. Evidence at trial revealed that the pickup

that had caused the congestion was being driven by a 13-year-old "mentally retarded or emotionally disturbed" boy who had decided to visit his doctor.

Rick McEwen was among the numerous drivers whose vehicles subsequently were stopped by the traffic jam. McEwen testified that although he had been traveling at 65 miles per hour in the fast, northbound lane when he first saw the congestion, he was able to slow down without any difficulty. He also testified that after stopping he saw in his rearview mirror a blue Maverick "coming up quite fast behind him"; he stated that he next saw the front of the Maverick dip as though the brakes were set. Suddenly, the Maverick shot across the median "just like a blue blur" and crashed head-on into a southbound car. Analysis of skid marks and other physical evidence supported expert testimony that the driver of the Maverick had lost control of the car in a centrifugal skid on the pavement before the vehicle crossed the median area into the on-coming traffic.

Dolores Glass, the driver of the blue Maverick, was killed in the accident. Patricia Ducey, who was driving the southbound car struck by the Maverick, suffered severe personal injuries, including brain damage. Dennis Ducey, who was riding in the front passenger seat of the Ducey car, was knocked unconscious by the accident and suffered additional serious injuries, although his injuries were not as severe as those of his wife.

Thereafter, the Duceys instituted the present action, joining as defendants the State of California and Argo Sales, along with Dolores Glass' estate.[1] Plaintiffs' claim against the state rested upon the state's failure to provide a median barrier on the heavily traveled freeway where the accident occurred. Evidence adduced at trial indicated that a properly built barrier effectively eliminates all cross-median freeway accidents, and plaintiffs contended that in light of the extent of freeway traffic and the prior history of cross-median accidents in the vicinity of the accident site, the state should share legal responsibility for the accident.

In support of their action against the state, plaintiffs presented a wealth of evidence concerning both the accident site and the state's procedures governing the placement of median barriers. In brief summary,

---

[1]Plaintiffs joined a number of other individuals as defendants at trial, but plaintiffs' claims against those defendants are not relevant to the instant appeals.

the evidence revealed the following facts: In the vicinity of the accident, route 17 is a four-lane, limited-access highway, in which the two northbound lanes and the two southbound lanes are separated by a forty-six-foot wide dirt median with tall oleander bushes growing in the middle. The freeway was built in 1958. From 1965 to 1969, traffic between Warm Springs Boulevard and Jarvis Avenue in Fremont, the stretch encompassing the accident site, increased by more than 40 percent.

The criteria used by the state to determine whether it should authorize the installation of a median barrier are called "warrants." These "warrants" are contained in manuals issued by the Department of Transportation to its planning staff. According to the 1968 guidelines, the construction of a barrier on a 46-foot wide median was justified when average daily traffic exceeded 40,000 vehicles. Daily traffic on route 17 in Fremont exceeded 40,000 vehicles beginning in November 1968, more than three years before the Ducey's accident.

In June 1967 a member of the department's engineering staff in Sacramento sent a memo to the regional headquarters responsible for route 17 in Fremont requesting "that barriers be installed at all locations meeting barrier warrants, unless reconstruction will cause the removal of the barrier within three years of the barrier installation for cable barriers, or within five years for beam barriers." Employees of the regional headquarters submitted a response to Sacramento on November 30, 1967. This report stated that the "warrants" for construction of a median barrier in Fremont had been met. The report recommended construction of a cable-type median barrier along 16.55 miles of the highway, including the Fremont section in which the instant accident occurred.

Highway Department documents introduced by plaintiffs at trial revealed that between 1964 and 1967, 18 cross-median accidents occurred in the 8.44-mile stretch of route 17 which included the crash site. Those accidents killed 4 people and hurt approximately 42 others—an average of one injury every 23 days. In requesting funds for the cable-type barrier in 1967, the regional office of the department concluded that the rate of cross-median injuries on route 17 around Fremont was "unusually high."

On July 12, 1968, the state Highway Commission granted the department's request for funds to build the proposed barrier, and

authorized the allocation of $220,000 for that purpose. Approximately four months later, the state awarded a contract for the construction of the barrier to a private contractor.

In February 1969, however, the appropriation was cancelled because of an anticipated widening of the highway in 1972-1973 which under department standards would necessitate the use of a metal beam guardrail rather than a cable-type barrier. As a consequence of this determination, the state chose to leave route 17 in Fremont without a needed median barrier for more than three years; the Duceys' accident occurred during that period. According to the testimony of a state employee, a barrier probably would have saved Mrs. Glass' life and prevented any injury to the Duceys. Plaintiffs maintained that in light of these circumstances, the state should be held liable for the resulting damages.

As noted above, in addition to pursuing their claim against the state, plaintiffs also sued Argo Sales, Dolores Glass' employer, asserting that Glass was acting in the scope of her employment at the time of the fatal accident and that Argo was consequently liable for the resulting injuries under "respondeat superior" principles. Evidence at trial revealed that Glass had been employed by Argo Sales for almost 20 years to clean model homes at various locations in San Jose, Alameda and Union City and that she regularly drove up to 45 miles from her residence to such model homes several days a week; the accident in this case occurred when Glass was returning home after performing her job. Although plaintiffs introduced evidence that on occasion Glass carried some cleaning equipment in her car, and at times traveled by car to pick up small furnishings for the model homes, there was no evidence that Argo Sales required Glass to do so; Argo Sales introduced evidence demonstrating that it had never reimbursed Glass for commuting expenses and did not pay her for the time she spent driving to work.

At the conclusion of the presentation of evidence, the trial judge instructed the jury on the various theories of liability pertaining to each defendant and, after deliberation, the jury returned a verdict finding Dolores Glass' estate and the State of California liable for the substantial damages sustained by the Duceys. At the same time, the jury returned a separate verdict absolving Argo Sales of any liability to the Duceys.

As already noted, the state and the Duceys have appealed from separate aspects of the judgments entered pursuant to the jury verdict. We turn initially to the state's appeal.

2. ■ *Under Government Code section 835, the state could properly be held liable for failing to erect a median barrier to protect freeway drivers from the serious injuries inherent in cross-median accidents.*

In arguing that the trial court erred in leaving the question of its liability to the jury, the state initially contends that it owed no "legal duty" to plaintiffs which required it to take measures, such as constructing a median barrier, to protect plaintiffs from dangers that allegedly were not of the state's own making. Thus, while the state acknowledges that it would bear responsibility for accidents resulting, for example, from a pothole or crack in a state-maintained roadway, the state takes the position that it is entitled to be absolved of liability as a matter of law whenever an accident occurs "merely" because of the absence of some protective traffic safeguard and not as a result of a physical aberration or defect of a public highway. Because in the instant case the conduct of the Glass vehicle, rather than any defect in the roadway, was, in the state's view, the precipitating cause of the accident, the state maintains that the trial court should have directed a verdict in its favor.

The state's limited view of the circumstances under which it may be held liable for damages for accidents on the public highways is directly refuted both by the explicit language of the controlling statutes and by the holdings of numerous prior decisions of this court and the Courts of Appeal. As we shall explain, these authorities clearly demonstrate that when, as in this case, the state has actual or constructive notice of a "dangerous condition" on a public highway, the state bears an affirmative obligation to take reasonable steps to protect the public against the danger. If the state fails to take such reasonable protective measures and its failure prommately causes plaintiff's injuries, the state may be held liable for the resulting damages.

In analyzing the question of the state's liability, we begin with the provisions of section 835 of the Government Code, one of the principal sections of the comprehensive California Tort Claims Act dealing with governmental liability for "Dangerous Conditions of Public Property." (See generally Gov. Code, § 830 et seq.) ■ Generally speaking, un-

der section 835[2] a public entity is liable for an injury if the plaintiff establishes: (1) "that the property was in a dangerous condition at the time of the injury"; (2) "that the injury was proximately caused by the dangerous condition"; (3) "that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred"; and (4) either (a) that a public employee negligently or wrongfully "created the dangerous condition" *or (b) that "[t]he public entity had actual or constructive notice of the dangerous condition under section 835.2[3] a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."* (Italics added.)

As the emphasized language indicates, section 835 specifically provides that when a public entity has actual or constructive notice of a dangerous condition, the entity's liability may be predicated on its failure to take protective measures to safeguard the public from dangers that may not necessarily be of the entity's own creation. This reading of section 835 is confirmed by reference to section 830, subdivision (b),

[2]Section 835 provides in full: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Unless otherwise specified, all statutory references are to the Government Code.

[3]Section 835.2 provides in full: "(a) A public entity had actual notice of a dangerous condition within the meaning of subdivision (b) of Section 835 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character.

"(b) A public entity had constructive notice of a dangerous condition within the meaning of subdivision (b) of Section 835 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. On the issue of due care, admissible evidence includes but is not limited to evidence as to:

"(1) Whether the existence of the condition and its dangerous character would have been discovered by an inspection system that was reasonably adequate (considering the practicability and cost of inspection weighted against the likelihood and magnitude of the potential danger to which failure to inspect would give rise) to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended to use the public property and for uses that the public entity actually knew others were making of the public property or adjacent property.

"(2) Whether the public entity maintained and operated such an inspection system with due care and did not discover the condition."

which specifically defines the "protect against" language of section 835, subdivision (b) to include "providing safeguards against a dangerous condition."[4] Thus, the language of the applicable statutes refutes the state's argument that it is under no "duty" to protect the public against dangers that are not created by physical defects in public property. (See generally Van Alstyne, Cal. Government Tort Liability (Cont. Ed.Bar 1964) §§ 6.21, 6.26, pp. 204-205, 211.)

Moreover, the governing case law similarly rejects the state's initial argument. This court's landmark case of *Baldwin* v. *State of California* (1972) 6 Cal.3d 424 [99 Cal.Rptr. 145, 491, P.2d 1121] is directly in point. In *Baldwin,* the plaintiff was injured while attempting to make a left-hand turn on a heavily traveled four-lane highway; no separate left-hand turn lane had been provided, and while waiting to make the turn the plaintiff was rear-ended and pushed into on-coming traffic.

The plaintiff in *Baldwin* sued both the driver who had rear-ended his car and the state; as in the instant case, in support of the claim against the state plaintiff introduced evidence of numerous similar accidents that had previously occurred at the same site. Plaintiff also adduced the testimony of highway safety experts as to the availability of safety measures, e.g., prohibiting left-hand turns or constructing an overpass or a separate left-hand turn lane, which the state could have implemented to protect against the "dangerous condition" created by the existing traffic conditions. Despite the fact that plaintiff's injury was not precipitated by a pothole or other "physical defect" in the public roadway, our court held that plaintiff's evidence would "amply support a finding that the intersection represented a dangerous condition" (*id.,* at p. 428) and that the state could be held liable for its failure to take reasonable steps to protect against such danger.

In similar fashion, numerous Court of Appeal decisions decided over the past two decades confirm the conclusion that a public entity's liability under section 835 may be predicated upon a failure of the entity to provide adequate safeguards against a dangerous condition of which the entity had actual or constructive notice. (See, e.g., *Chavez* v. *Merced* (1964) 229 Cal.App.2d 387, 394-397 [40 Cal.Rptr. 334] (failure to

---

[4]Section 830, subdivision (b) provides in full: "As used in this chapter...(b) 'Protect against' includes repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition."

warn of danger from fallen utility line); *Bakity* v. *County of Riverside* (1970) 12 Cal.App.3d 24, 30 [90 Cal.Rptr. 541] (failure to protect against obstructed view caused by trees on adjacent private property); *Briggs* v. *State of California* (1971) 14 Cal.App.3d 489 [92 Cal.Rptr. 433] (failure to warn of mudslides from adjacent private property); *Vedder* v. *County of Imperial* (1974) 36 Cal.App.3d 654, 658-660 [111 Cal.Rptr. 728] (failure to provide protective devices against fire danger); *Slapin* v. *Los Angeles International Airport* (1976) 65 Cal.App.3d 484 [135 Cal.Rptr. 296] (failure to provide adequate lighting for safety).)

Indeed, several recent Court of Appeal cases are particularly instructive for the present case, confirming the state's potential liability under section 835 for failure to provide an adequate median barrier on a public roadway. (See, e.g., *Morris* v. *State of California* (1979) 89 Cal.App.3d 962, 965-966 [153 Cal.Rptr. 117]; *Harland* v. *State of California* (1977) 75 Cal.App.3d 475, 485-486 [142 Cal.Rptr. 201].) Consequently, we reject the state's contention that liability could not properly be assessed on the basis of its "mere" failure to protect against cross-median accidents.

■ The state alternatively argues that even if it does bear an affirmative duty under section 835 to protect against the hazards of "dangerous conditions" which it has not created, the trial court nonetheless erred in submitting the issue of its liability to the jury because, it contends, plaintiff introduced no substantial evidence from which the jury could have concluded that the absence of a median barrier constituted a "dangerous condition" within the meaning of the relevant statutory provisions. Although the state concedes that the jury was properly instructed on the issue and implicitly found that a "dangerous condition" did in fact exist, the state maintains that in light of the evidence presented by the plaintiffs the trial court should not have permitted the issue to go to the jury. We conclude that the issue was properly left to the jury.

Section 830, subdivision (a) defines a "dangerous condition" as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property *is used with due care* in a manner in which it is reasonably foreseeable that it will be used." (Italics added.) The state recognizes that if the condition of its property creates a substantial risk of injury even when the property is used with due care, the state gains

no immunity from liability simply because, in a particular case, the dangerous condition of its property combines with a third party's negligent conduct to inflict injury. (See, e.g., *Baldwin* v. *State of California, supra,* 6 Cal.3d 424, 428, fn. 3; *Mathews* v. *State of California* (1978) 82 Cal.App.3d 116, 121 [145 Cal.Rptr. 443]; *Murrell* v. *State of California* ex rel. *Dept. Pub. Wks.* (1975) 47 Cal.App.3d 264, 267-270 [120 Cal.Rptr. 812]; *Bakity* v. *County of Riverside, supra,* 12 Cal.App.3d 24, 32; *Callahan* v. *City and County of San Francisco* (1967) 249 Cal.App.2d 696, 702-704 [57 Cal.Rptr. 639].) The state asserts, however, that cross-median freeway accidents usually result from the negligence of either the victim or a third party, and therefore that the jury could not properly conclude that the absence of a median barrier created a substantial risk of injury when the freeway was used with due care.[5]

Although it may well be that many, perhaps even most, cross-median accidents result from the negligence of one or more drivers, the evidence in the instant case was clearly sufficient for the jury to conclude that the lack of a median barrier created a substantial risk of injury even in the absence of negligent conduct. One state highway engineer testified at trial that in cross-median accidents "it is not uncommon to have the violating vehicle be an innocent party." In addition, during the course of the trial numerous expert witnesses identified various situations in which cross-median accidents might occur in the absence of negligence, as when accidents result, for example, from mechanical failure, sudden illness, or animals in the road.

---

[5]In an amicus brief filed in this case, the California Trial Lawyers Association (CTLA) argues that, properly interpreted, the provisions of section 830, subdivision (a) should not bar recovery by persons, such as the plaintiffs in the instant case, who personally exercise due care on public property, even when the risks created by the condition of state property arise only as a result of the negligent conduct of third parties. In support of its argument, CTLA points to a portion of the Law Revision Commission comment accompanying section 830, which states, "A condition is not dangerous within the meaning of this chapter unless it creates a hazard *to those who foreseeably will use the property or adjacent property with due care.* Thus, even though it is foreseeable that persons may use public property without due care, a public entity may not be held liable for failing to take precautions *to protect such persons.*" (Italics added.)

Inasmuch as we conclude that there is sufficient evidence in the instant case to support a determination that the absence of a median barrier constituted a dangerous condition to the driving public even when the freeway was used with due care, we have no occasion at present to address the CTLA's suggested construction. (Compare, e.g., *Murrell* v. *State of California* ex rel. *Dept. Pub. Wks., supra,* 47 Cal.App.3d 264, 267-272 & fn. 7 with *Mathews* v. *State of California, supra,* 82 Cal.App.3d 116, 120-122. See also Van Alstyne, Cal. Government Tort Liability (Cont.Ed.Bar 1964) pp. 194-195.)

Moreover, in evaluating the evidence and applying the definition of "dangerous condition" contained in the judge's instructions, the jurors were free to draw upon their own common driving experiences which might well have suggested to them that many traffic accidents, including cross-median accidents, occur without the negligence of any party. As the Court of Appeal recently noted in *Morris* v. *State of California, supra,* 89 Cal.App.3d 962, 965, in rejecting an identical argument of the state: "[The median barrier's] obvious function was to protect motorists on the freeway from the intrusion into their lanes of vehicles crossing the median out of control *whether by reason of mechanical or tire failures or other causes unrelated to negligence or by reason of the negligence of those drivers and owners.*" (Italics added.) Accordingly, we conclude that the jury could properly find that the barrierless, heavily traveled freeway constituted a dangerous condition under sections 835 and 830, subdivision (a).

Finally, the state argues that as a matter of financial reality it cannot afford to construct median barriers on all freeways on which such barriers are needed and consequently it urges this court, as a matter of policy, to relieve it of liability resulting from its failure to install such barriers. ■ Under section 835.4, subdivision (b),[6] however, the question of the reasonableness of the state's action in light of the practicability and cost of the applicable safeguards is a matter for the jury's determination. (See, e.g., *Baldwin* v. *State of California, supra,* 6 Cal.3d 424, 436-438; *De La Rosa* v. *City of San Bernardino* (1971) 16 Cal.App.3d 739, 749 [94 Cal.Rptr. 175].) In the instant case, the jury was instructed as to the provisions of section 835.4 at the state's request, and the jury's ultimate verdict demonstrates that it concluded that the state had not established that its failure to provide a median barrier in the vicinity of the accident was reasonable in light of the practicability and cost of such a safeguard. The state has not identified anything in the record which would justify disturbing the jury's determination on this point.

---

[6]Section 835.4, subdivision (b) provides in full: "A public entity is not liable under subdivision (b) of Section 835 for injury caused by a dangerous condition of its property if the public entity establishes that the action it took to protect against the risk of injury created by the condition or its failure to take such action was reasonable. The reasonableness of the action or inaction of the public entity shall be determined by taking into consideration the time and opportunity it had to take action and by weighing the probability and gravity of potential injury to persons and property foreseeably exposed to the risk of injury against the practicability and cost of protecting against the risk of such injury."

Accordingly, we conclude that the plaintiffs' judgment against the state should be affirmed.

3. *The jury's implied finding that Dolores Glass was not acting in the scope of her employment at the time of the accident is supported by substantial evidence and thus the judgment in favor of Argo Sales must stand.*

As noted above, plaintiffs have appealed from the judgment in favor of Argo Sales, Dolores Glass' employer, contending that the trial court should have found Argo Sales liable as a matter of law. After independent examination of the briefs and the record in this case, we have concluded that the opinion of the Court of Appeal, First Appellate, District Four, prepared by Justice Christian and concurred in by Presiding Justice Caldecott and, in this respect, Justice Rattigan, correctly treats and disposes of this issue and we adopt the following portion of the opinion (with appropriate deletions and additions) as the opinion of this court on this issue:*

■ The Duceys contend that the judgment in favor of Argo Sales Co. must be reversed because the evidence demonstrates as a matter of law that Dolores Glass was acting within the scope of her employment while driving home from work on the day of the accident. The argument is that the evidence shows, as a matter of law, that the use of her personal vehicle was an implied condition of Glass' employment.

■ Under the doctrine of respondeat superior, an employer is liable for the torts of his employees committed within the scope of their employment (see Civ. Code, § 2338; see also *Vind v. Asamblea Apostolica, Christo Jesus* (1957) 148 Cal.App.2d 597, 604 [307 P.2d 85]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) § 155, p. 754). The burden of proof is on the plaintiff to demonstrate that the negligent act was committed within the scope of employment. [ ] [(See, e.g., *Lane v. Bing* (1927) 202 Cal. 577, 580-581 [262 P. 317]; *Tarasco v. Moyers* (1947)

---

*Brackets together, in this manner [ ] *without enclosing material,* are used to indicate deletions from the opinion of the Court of Appeal; brackets *enclosing material* (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. We thus avoid the extension of quotation marks within quotation marks, which would be incident to the use of such conventional punctuation, and at the same time accurately indicate the matter quoted. In so doing, we adhere to a method of adoption employed by us in the past. (See *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311, fn. 2 [70 Cal.Rptr. 849, 444 P.2d 481], and cases there cited.)

81 Cal.App.2d 804, 810 [185 P.2d 86].)] Whether an act is within the scope of employment is a question of fact (see *Harvey* v. *D & L Construction Co.* (1967) 251 Cal.App.2d 48, 52 [59 Cal.Rptr. 255]; *De Mirjian* v. *Ideal Heating Corp.* (1954) 129 Cal.App.2d 758, 771 [278 P.2d 114]).

 Under the so-called "going and coming rule," an employee is not regarded as acting within the scope of his employment while going to or coming from his place of work. (*Hinman* v. *Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 961 [88 Cal.Rptr. 188, 471 P.2d 988]; *Harris* v. *Oro-Dam Constructors* (1969) 269 Cal.App.2d 911, 912 [75 Cal.Rptr. 544]; *Harvey* v. *D & L Construction Co., supra,* 251 Cal. App.2d 48, 51; 1 Witkin, Summary of Cal. Law, *supra,* § 167, at p. 766.) The courts, however, have recognized several exceptions to the "going and coming" rule.

In the "going and coming" cases, the California courts often cite tort and workers' compensation cases interchangeably. As Mr. Witkin points out, however, "This practice has been questioned, for compensation rules were developed from a distinct social philosophy, with fault eliminated as a test, and liberal construction of the act required." (1 Witkin, Summary of Cal. Law, *supra,* § 167, p. 766; see *Church* v. *Arko* (1977) 75 Cal.App.3d 291 [142 Cal.Rptr. 92]; *Harris* v. *Oro-Dam Constructors, supra,* 269 Cal.App.2d 911, 914; *McGarvey* v. *Pacific Gas & Elec. Co.* (1971) 18 Cal.App.3d 555, 563 [95 Cal.Rptr. 894] [ ].) In *Hinman* v. *Westinghouse Elec. Co.,* the California Supreme Court relied upon workers' compensation cases, stating that "Although the test under the workmen's compensation law of 'arising out of and in the course of the employment' (Lab. Code, § 3600), is not identical with the test of 'scope of employment' under the *respondeat superior* doctrine...the two tests are closely related...." (2 Cal.3d at fn. 3, p. 962.)

The courts have recognized an exception to the "going and coming" rule where the employer compensates the employee for travel time. (*Hinojosa* v. *Workmen's Comp. Appeals Bd.* (1972) 8 Cal.3d 150, 159 [104 Cal.Rptr. 456, 501 P.2d 1176]; *Hinman* v. *Westinghouse Elec. Co., supra,* 2 Cal.3d 956, 962.) An exception has also been recognized where a negligent act was committed while the employee was engaged in a special errand for the employer. (See *Trejo* v. *Maciel* (1966) 239 Cal.App.2d 487 [48 Cal.Rptr. 765]; [ ] [*Sullivan* v. *Thompson* (1939)

30 Cal.App.2d 675, 677-678 (87 P.2d 62)].) ▮ In the present case, Argo Sales Co. did not defray Glass' travel expenses or compensate her for travel time. She was not engaged in a special errand for her employer at the time of the accident.

▮ The "going and coming" rule has also been held inapplicable, however, in cases where the employer requires an employee to furnish a vehicle of transportation on the job. (See *Hinojosa* v. *Workmen's Comp. Appeals Bd., supra,* 8 Cal.3d 150, 160; *Smith* v. *Workmen's Comp. Appeals Bd.* (1968) 69 Cal.2d 814 [73 Cal.Rptr. 253, 447 P.2d 365]; *Richards* v. *Metropolitan Life Ins. Co.* (1941) 19 Cal.2d 236 [120 P.2d 650]; *Huntsinger* v. *Glass Containers Corp.* (1972) 22 Cal. App.3d 803, 807 [99 Cal.Rptr. 666].) ▮ The evidence does not establish as a matter of law that the company required Glass, as a condition of her employment, to commute to work in her personal car. The job was not one that embraced driving, and Glass was not required to use her vehicle for field work. Although there was evidence that she occasionally ran errands for her employer, these trips were not conclusively shown to be a condition of her employment. The jury could reasonably have believed that Glass was acting as a volunteer in running occasional errands for replacement items. She was not engaged in such an errand at the time of the accident. There is no evidence that Glass was required to go from location to location during the day. (Cf. *Hinojosa* v. *Workmen's Comp. Appeals Bd., supra,* 8 Cal.3d 150, 161.) Although Glass transported cleaning materials in her car to her place of work, the evidence does not establish as a matter of law that Glass was required to transport that equipment. The employer provided "ample storage space" and garages at each tract in which cleaning equipment could have been stored. The jury could have found that the taking of equipment home each night was for the personal benefit and convenience of Glass, who worked at other cleaning jobs, and was thus merely incidental to her employment. (See *Hinson* v. *Workmen's Comp. Appeals Bd.* (1974) 42 Cal.App.3d 246, 251 [116 Cal.Rptr. 792].) The evidence does not establish as a matter of law that Argo Sales Co. should have been held liable for the results of Glass' negligent conduct.

4. *Conclusion.*

In sum, we have concluded that there is no basis for upsetting the verdicts against the State of California and in favor of Argo Sales.

Accordingly, the judgments are affirmed. Plaintiffs shall recover their costs on appeal from the State of California. Argo Sales shall recover its costs on appeal from plaintiffs.

Bird, C. J., Mosk, J., and Newman, J., concurred.

**CLARK, J.,** Concurring and Dissenting.—It is obvious to anyone driving our streets, roads and freeways that absent an impenetrable barrier against oncoming traffic, constant risk exists that another vehicle will cross the median line by reason of mechanical defect or careless driving. Designing and building freeways, roads and streets, governmental agencies can, should and do take precautions against risk of injury caused both by negligently built or maintained vehicles and by speeding, drunk and other negligent drivers. However, failure of government to take precautions against such vehicles or drivers does not furnish a basis for monetary recovery from the general fund.

The statutory definition of dangerous condition of property is clear, limiting dangerous conditions to those involving substantial risk when the property *is used with due care* in a reasonably foreseeable manner. (Gov. Code, § 830.)[1] While it is readily foreseeable that vehicles will go out of control, crossing the median line and colliding with oncoming traffic on all freeways, roads and streets, foreseeability is not the sole statutory test. Government cannot guarantee that roadways will not be used by defective cars or careless drivers. Liability is imposed only when substantial danger exists despite careful usage. Applying the statutory standard, evidence in the instant case is insufficient to establish a dangerous condition of property.

FACTS

In February 1972 Dolores Glass lost control of her car and crossed the freeway median of State Route 17, colliding with plaintiffs' vehicle. She was killed and plaintiffs were seriously injured.

In the area of the accident State Route 17 comprised two lanes each way when the accident occurred. Traffic was separated by a 46-foot median area containing oleander plants, and no physical median barrier existed. Absence of a barrier is the sole basis for plaintiffs' claim the state is responsible for the accident. Barriers eliminate all or almost all

---

[1]All statutory references are to the Government Code.

cross-median accidents, but because they reduce the area in which a driver entering the median area may regain control of his car, barriers increase the number of injury accidents. Cross-median accidents ordinarily involve greater injury than accidents resulting from striking of the barrier and bouncing back into traffic.

From 1964 to mid-1967, approximately 50 million vehicles travelled an 8-mile section of State Route 17 including the accident area; there were 423 accidents; and in eight of them a vehicle crossed the median and collided with oncoming traffic resulting in two fatalities.[2] Based on accident statistics covering a 16-mile stretch of the highway including the accident area and traffic volume projections, district state highway engineers in November 1967 recommended a cable-type barrier for a 16-mile area including the accident area.[3]

In July 1968 the California Highway Commission allocated funds for construction of a median barrier for 16 miles including the accident site, and in November a contract was awarded to U. S. Steel to construct a cable barrier.

The state maintained a general policy of refusing to build barriers if reconstruction would cause removal of cable barriers within three years or of beam barriers within five years. A $27.3 million construction budget increase permitted widening an 8-mile stretch of the highway including the accident area, and a few days after the contract for the barrier was awarded, U. S. Steel was advised by the resident engineer that the 8-mile stretch was to be deleted from the contract. In February 1969 the district head of construction ordered the eight-mile stretch deleted because the new widening project called for a beam barrier. In April 1972 two months after the accident, the state embarked upon the widening project, adding one lane of traffic in each direction, reducing the median area to twenty-two feet and adding a beam barrier.

[2]Apparently there were 10 additional accidents not involving oncoming traffic where a vehicle crossed the median.

[3]The state used a system of "warrants" to determine whether barriers should be installed. The "warrant" system was a guideline and not followed rigorously. The warrant system was not directly applicable to the accident site in 1967. It applied only where the median area was less than 46 feet. There is a conflict in the evidence whether the warrant system applied under the 1968 revisions of the system. Although the published manual did not state the 46-foot limitation, the state engineers who prepared the revisions stated that a cover letter sent with the manual explained that it applied to median areas less than 46 feet. However, one of plaintiffs' engineers testified that the revisions were applicable and called for a barrier. According to the state witnesses, it was not until 1971 that the median width factor was increased to 50 feet.

"Section 815 of the Government Code declares: (a) a public entity is not liable for any injuries except as provided by statute; and (b) any statutorily established liability is subject to both statutory immunities and the defenses that would be available to the public entity were it a private person....[¶] To impose liability for a dangerous condition of property under section 835, a plaintiff must establish 'that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred,...'" (*Hayes* v. *State of California* (1974) 11 Cal.3d 469, 471 [113 Cal.Rptr. 599, 521 P.2d 855], fn. omitted.)

As defined by section 830, a dangerous condition is "a condition of property that *creates* a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury when such property or adjacent property *is used with due care* in a manner in which it is reasonably foreseeable that it will be used." (Italics added.)

A number of cases have recognized that it is not the care or lack of care of the plaintiff or a third party in the particular case that is decisive but rather the due care requirement means that the condition must be dangerous when used with due care by the public generally. (E.g., *Murrell* v. *State of California* ex rel. *Dept. Pub. Works* (1975) 47 Cal. App.3d 264, 267 [120 Cal.Rptr. 812]; *Sykes* v. *County of Marin* (1974) 43 Cal.App.3d 158, 161 et seq. [117 Cal.Rptr. 466]; *Shipley* v. *City of Arroyo Grande* (1949) 92 Cal.App.2d 748, 750-751 [208 P.2d 51].)

The section 830 condition that property be dangerous when used with due care means the state does not guarantee accidents will not occur upon its property. Further, the state does not guarantee its property will not be used by criminal or negligent persons, and when substantial danger of injury arises solely from criminal or negligent users, section 830 precludes liability. Thus the state is not required to build fail-safe highways. The best constructed highways are dangerous when used by speeders, drunk drivers and defective vehicles. The state is not required to respond in damages to negligent drivers or operators of defective vehicles under *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], or to innocent persons harmed by them when the highway—used with due care—is safe.

"'The "dangerous condition" of the property should be defined in terms of the manner in which it is foreseeable the property will be used by persons exercising due care in recognition that *any property can be dangerous if used in a sufficiently abnormal manner.* [Italics added.] Thus, a public entity should not be liable for injuries resulting from use of a highway—safe for use at 65—at 90 miles an hour even though it may be foreseeable that persons will drive that fast. The public entity should only be required to provide a highway that is safe for reasonably foreseeable *careful* use.' (4 Cal. Law Revision Com. Rep. (1963) p. 822.)" (*Fuller v. State of California* (1975) 51 Cal.App.3d 926, 939-940 [125 Cal.Rptr. 586].)

In *Hayes v. State of California, supra,* 11 Cal.3d 469 the plaintiffs contended that the governmental entity aware that undesirable persons frequented its beach, committing dangerous crimes there, had a duty to warn of a dangerous condition. Rejecting the contention, we stated: "Liability for injury caused by a dangerous condition of property has been imposed when an unreasonable risk of harm is created by a *combination* of defect in the property and acts of third parties. (E.g., *Baldwin v. State of California* (1972) 6 Cal.3d 424 [99 Cal.Rptr. 145, 491 P.2d 1121]; *Quelvog v. City of Long Beach* (1970) 6 Cal.App.3d 584, 591-592 [86 Cal.Rptr. 127].) However, courts have consistently refused to characterize harmful third party conduct as a dangerous condition— absent some concurrent contributing defect in the property itself. (See, e.g., *Jones v. Czapkay* (1960) 182 Cal.App.2d 192, 203 [6 Cal.Rptr. 182] (presence of tuberculosis carrier on street does not constitute dangerous condition of property); *Seybert v. County of Imperial* (1958) 162 Cal.App.2d 209, 212, 214 [327 P.2d 560] (if lake itself not dangerous, no liability for waterskiing accident caused by third person's negligence); *Campbell v. City of Santa Monica* (1942) 51 Cal.App.2d 626, 629 [125 P.2d 561] (no liability for failure to warn pedestrians of foreseeably negligent use of streets by motorists).)[2] In support of this characterization are the sections following section 830 (§§ 830.2 through 831.8) limiting liability for dangerous conditions. All are based on some physical feature of the property.[3]" (11 Cal.3d at p. 472.)

"[2]Although the above cited cases were decided under the Public Liability Act of 1923, the superseding statutes are substantially similar to that act in relevant respects. (See former § 53051 and Legislative Com. comment to present § 835, West's Ann. Gov. Code (1966 ed.) p. 185.)"

"[3]Similarly, a private landowner's liability is ordinarily based on a defect of the property or on his active conduct (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112 et seq. [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]); and in the absence of a special relationship, he is under no duty to protect against the wrongful conduct of third parties. (See Rest.2d Torts, §§ 315, 344.)"

As we drive the freeways, roads and streets of California, we must recognize there is a risk vehicles will cross the median line. Evidence in the instant case fails to show that the condition of the highway in any way increased such risk or caused Glass or anyone else to cross the median. There is no evidence any person using due care had ever crossed the median area and collided with oncoming traffic, and the evidence is insufficient to establish the highway created substantial danger when due care was used.

The fact the state decided to build a cable barrier and then abandoned its plan does not demonstrate the roadway was defective. Obviously the state, like any private individual, may take precautions for the careless as well as the careful person.

Nor does an engineer's conclusion that the rate of cross-median injuries was "unusually high" establish that the road was dangerous when used by persons exercising due care. It is unlawful to drive across the median line of a divided highway (Veh. Code, § 21651), and a driver who crosses the median is presumptively negligent. (See *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 622 [327 P.2d 897]; *Altomare* v. *Hunt* (1950) 101 Cal.App.2d 10, 13 [224 P.2d 904].) Moreover, when a driver permits his vehicle to leave the road, the doctrine of res ipsa loquitur is applicable. (*Faulk* v. *Soberanes* (1961) 56 Cal.2d 466, 470 [14 Cal.Rptr. 545, 363 P.2d 593].) Because all such accidents are presumptively the product of negligence, unusually high incidence of accidents suggests only unusually high incidence of negligent drivers; it does not suggest that any accident occurred without fault of one of the drivers.

Attempting to meet the statutory requirement of danger when due care is used, the majority rely on testimony of a highway engineer that "it is not uncommon to have the violating vehicle be an innocent party," on expert witness testimony of hypothetical situations of cross-median accidents occurring without the negligence of anyone, and on jurors' own driving experience assertedly permitting inferences that cross-median accident may occur without the negligence of any party.

Such general hypothetical testimony—indicating a possibility of non-negligence—could be presented in any case of a cross-median accident. The evidence has no more relation to highway conditions in the instant case than in any other case. Similarly, the jury experience would always

be available.[4] Because the factors relied upon by the majority are available in every cross-median accident case, the effect of today's decision is that the juries are free to make the state an insurer in all cross-median accidents. In any event, mere possibility that a cross-median accident could occur without faulty driving or defective vehicle does not show that any such accident ever occurred on the highway in this case or any other specific highway.

No evidence exists to show the highway was dangerous when the public exercised due care using it. Therefore, the state was required to do nothing in prevention of plaintiffs' injuries.

The judgment should be reversed.

Richardson J., and Manuel, J., concurred.

The petition of the respondent State of California for a rehearing was denied January 17, 1980. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.

---

[4]Because of the rarity of cross-median accidents, it is doubtful whether many jurors have had any experience with them.